# United States Court of Appeals
## For the First Circuit

No. 01-1969

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL HORNBECKER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Howard, Circuit Judge.

Sara Rapport, with whom Perkins, Smith & Cohen was on brief, for appellant.
Dickens Mathieu, Assistant U.S. Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

January 9, 2003

**HOWARD**, <u>Circuit Judge</u>.  In the course of a lengthy roadside stop, Illinois state troopers discovered more than 400 pounds of marijuana in a 1957 Volkswagen pickup truck that defendant Michael Hornbecker had been towing across the country.  Hornbecker subsequently pleaded guilty to conspiring to distribute marijuana, but reserved his right to appeal the district court's earlier denial of his suppression motion.  Hornbecker acknowledges that he voluntarily signed a consent-to-search form approximately 23 minutes after he was stopped, but argues that the ensuing search was rendered unlawful by the troopers' prior Fourth Amendment violations.  We disagree and accordingly affirm.

## I.  Background

We take our factual recitation from the record of the proceedings below, which included the introduction into evidence of a videotape of the search made by the Illinois state police.  On August 16, 1998, at just prior to 7:58 p.m. (according to the timer on the police videotape), Illinois State Trooper John Rugen stopped Hornbecker as he was heading east on Interstate 80 in LaSalle County, Illinois.  Hornbecker was driving a 1987 Chevrolet pickup with California license plates and towing a flatbed trailer on which sat the Volkswagen.  Rugen, who was then a member of an Illinois state police drug interdiction unit that used routine traffic stops to further its purposes, told Hornbecker that he had been stopped for driving seven miles per hour over the applicable speed limit and for having a cracked windshield.

As Rugen was asking Hornbecker for his license and registration, he also inquired about Hornbecker's travel itinerary.  Hornbecker replied that he was driving from southern California to New

Hampshire to sell the Volkswagen. Rugen found this answer fishy because the Volkswagen did not appear sufficiently valuable to warrant a cross-country drive to sell it. He wondered whether Hornbecker might be transporting drugs in the Volkswagen because southern California is a drug source region and because the Volkswagen's unusual body style looked as though it contained a voluminous, difficult-to-access area behind the cab and between the bed and the undercarriage. Despite (or perhaps because of) his suspicion, Rugen's affect was friendly, even gregarious. Rugen informed Hornbecker that he was only going to give him a warning. While returning to the cruiser to write the warning, Rugen stepped up on the flatbed trailer so that he could further survey the Volkswagen's atypical body structure.

Rugen radioed for a check on Hornbecker's license, registration, and criminal history. Seconds later, Rugen radioed for a drug-sniffing dog to be brought to the scene. Almost immediately after requesting the dog, Rugen learned that Hornbecker had a valid driver's license and registration and no outstanding warrants or criminal history. Nevertheless, Rugen did not complete Hornbecker's warning and send him on his way. Instead, at just after 8:02 p.m., Rugen returned to Hornbecker's car to ask whether Hornbecker had papers verifying ownership of the Volkswagen. Hornbecker replied that he did and, because the papers were in the Volkswagen, exited the Chevrolet to retrieve them.

As the two stood next to the old pickup, Rugen amiably and off-handedly questioned Hornbecker about it. Pointing to the enclosed area behind the cab, Rugen asked, "What is this, storage under here?"

Hornbecker replied, "That's the way it came, right? . . . The motor and gas tank is here." Hornbecker then entered the Volkswagen's cab and began to search for its paperwork. Rugen peered beneath the Volkswagen and noticed that the engine was not just behind the cab, as Hornbecker had indicated, but was all the way to the rear. Rugen returned to his cruiser and took a seat inside, while Hornbecker went back to the Chevrolet to retrieve his briefcase, where he now said he thought the paperwork was.

Between 8:06 and 8:07 p.m., Trooper Craig Graham arrived with a drug-sniffing dog. A few seconds later, Hornbecker walked back to Rugen's cruiser and told Rugen that he had not yet found the requested paperwork, but insisted he had it with him. Hornbecker then returned to his vehicles and resumed his search. Meanwhile, Graham approached Rugen's cruiser. Rugen told Graham that "this thing looks screwed up," explaining that the Volkswagen's engine was not where Hornbecker had said it was and expressing concern about the large, inaccessible space behind the truck's cab. Graham began to examine the Volkswagen, peering into its cab with a flashlight and stepping up on the trailer to look into its bed. He then returned to the driver's side of Rugen's vehicle, signaling that he would walk the dog around the tow trailer. Graham noted that another state trooper had "got one just like that. It was on the back of a Ryder truck."

Apparently now having located the Volkswagen's papers, at shortly after 8:08 p.m. Hornbecker brought them to Rugen, who invited Hornbecker to sit with him in the cruiser as he completed the warning. Rugen informed Hornbecker that Graham would be walking the dog around

Hornbecker's vehicles and asked whether Hornbecker was carrying anything illegal. Hornbecker replied that he was not. As Graham conducted the drug sniff, Rugen engaged in friendly banter with Hornbecker, asking him a number of questions about the Volkswagen and the vintage car trade. The dog did not alert. Shortly after 8:11 p.m., Rugen handed Hornbecker a written warning, returned all of his documents, and told him, "You're all set to go, free to leave." Hornbecker responded by asking Rugen about the effect of the warning. Rugen explained that it would show up in the computer if Hornbecker were stopped again in Illinois. Rugen again told Hornbecker that he was "all set to go," but then immediately asked whether he might take a look "at that engine compartment there," quickly explaining "I have never seen a truck like that before . . . . 'Course I'm only 31 years old." Hornbecker replied "You certainly may."

At just prior to 8:12 p.m., Rugen and Graham went to the rear of the Volkswagen (where Rugen understood the engine to be despite Hornbecker's earlier indication that it was behind the cab) and attempted to pry open the engine compartment's access door. Hornbecker said something about a screwdriver, to which Rugen responded, "Oh, it takes a screwdriver? I got a screwdriver." He retrieved one from his cruiser, opened the compartment door, and (with Graham) peered inside.

After completing their examination of the engine compartment, the troopers closed its access door and began to examine the remainder of the Volkswagen's exterior, tapping it, banging on it, and asking Hornbecker questions about it. At all times, the troopers were friendly. Rugen conveyed what was almost certainly a contrived fascination with the "big ole truck," at one point stating he might have

"to buy one of these." At around 8:14 p.m., Rugen asked Hornbecker if he could look in the Volkswagen's cab. Although Hornbecker's response is inaudible, the videotape suggests that Hornbecker consented.[1] A couple of minutes later, Rugen asked Hornbecker for the key to the gas port. Hornbecker replied that, like the engine compartment, the port could be accessed with a screwdriver. Rugen pried open the gas port, looked inside, and stated, "[T]his is not right." Rugen explained to Hornbecker, who himself had voluntarily removed some items from the truck's bed, that he was concerned about the unaccounted-for space in the area behind the cab. At just after 8:19 p.m., Rugen returned to his cruiser and radioed a request that another trooper bring him a device that measures the density of inaccessible areas. Rugen then returned to Hornbecker, reiterated his concern about the area behind the cab, and told Hornbecker that he wanted to bring somebody to the scene with a device for measuring spaces. Rugen subsequently asked Hornbecker to sign a form consenting to a search of the Volkswagen. At approximately

---

[1]At the suppression hearing, the following exchange took place during cross-examination of Trooper Rugen by counsel for the defendant:
Q: And now you're asking if you can look in the cab?
A: Yes, after again asking about that area of concern.
Q: And after looking underneath the vehicle?
A: Correct.
Q: Okay. And the reason you asked if you could look in the cab is that you didn't have permission by asking him to look in the engine compartment to look in the cab?
A: Correct.
Q: And he said, okay, yes, look in the cab?
A: That's right.
Q: So you look in the cab?
A: Yes, ma'am.
The district court found that Hornbecker had consented to Rugen's request to look in the cab.

8:20 p.m., nearly 23 minutes after being pulled over, Hornbecker voluntarily signed the form. About an hour and a quarter later, the troopers breached the space behind the cab and discovered the marijuana.

Illinois authorities subsequently charged Hornbecker with cannabis trafficking, but Hornbecker prevailed on a pretrial suppression motion which argued that the troopers had violated his Fourth Amendment rights. The state unsuccessfully appealed that ruling and eventually abandoned the prosecution. Meanwhile, as the state's appeal was pending, a federal grand jury sitting in Massachusetts indicted Hornbecker for participating in a multi-participant marijuana distribution conspiracy. Hornbecker subsequently filed a motion to suppress in the federal case, contending that his eventual written consent to the search was vitiated by the fact that Rugen began violating his Fourth Amendment rights at around 8:02 p.m., when Rugen continued to detain him despite learning that Hornbecker's license and registration were valid and that there were no outstanding warrants against him.

Hornbecker presented two arguments in support of this constitutional claim. First, he asserted that his detention from approximately 8:02 p.m. until approximately 8:11 p.m. (when Rugen gave him the warning, returned his documents, and told him that he was free to go) was unreasonable because Rugen lacked justification to continue the traffic stop after learning that Hornbecker was not wanted, had a valid license, and was driving a registered vehicle. Second, he maintained that the troopers' conduct was unreasonable between approximately 8:11 p.m. and approximately 8:20 p.m. because it involved

encroachments beyond the engine compartment search to which he consented.  In pressing this point, Hornbecker cited cases in which warrantless searches justified by consent were held unlawful because the challenged intrusions exceeded the scope of the consent given, e.g., United States v. Infante-Ruiz, 13 F.3d 498, 505 (1st Cir. 1994), but primarily argued that the written consent he eventually provided was ineffective because it was immediately preceded by a protracted period of unlawful detention.     The district court rejected Hornbecker's arguments.  The court opined that Hornbecker's detention prior to 8:11 p.m. was reasonable because Illinois law explicitly permits routine traffic stops to last up to 15 minutes.  The court further ruled that no constitutional problem was presented with respect to the period between 8:11 p.m. and the time Hornbecker signed the consent-to-search form because Hornbecker had been told that he was free to leave but consented to stay, to let the troopers conduct certain limited searches, and to answer the troopers' questions.  Yet in reaching its determinations, the court, in dicta, sided with Hornbecker and against the government on whether, prior to obtaining Hornbecker's written consent to a search, the troopers had a reasonable basis under Terry v. Ohio, 392 U.S. 1, 18-20 (1968), to detain Hornbecker on grounds other than speeding and driving with a cracked windshield: "[A]fter the conclusion of the legitimate traffic stop [which in the court's estimation occurred at 8:11 p.m.], the police would have violated the Fourth Amendment [by continuing to detain Hornbecker], and justified the suppression prayed for, had it not been for the fact that Hornbecker consented [to remain on the scene]."

II.  Discussion

Hornbecker asserts the same arguments on appeal that he advanced in the district court.  He contends that his detention was unlawful between approximately 8:02 p.m. and approximately 8:11 p.m. because it was unrelated to the reasons for the traffic stop and unsupported by a reasonable suspicion that he was engaged in some other unlawful conduct.  With respect to the period between approximately 8:11 p.m. and 8:20 p.m., his position remains a bit unclear, but we shall assume that he is challenging the troopers' conduct on both search and seizure grounds.  See pages 7-8, above.  In any event, Hornbecker's overall argument is straightforward and very capably presented:  the district court erroneously regarded as effective his written consent to the search which yielded the marijuana because it failed to appreciate that the troopers' prior conduct violated the Fourth Amendment.  We disagree.

We start with the latter of the two temporal periods in question and with Hornbecker's largely unelaborated suggestion that suppression remedy is warranted by one or more unlawful searches which took place in this interim.  We reject the suggestion.  The district court made express factual findings that Hornbecker consented to the troopers' searches of the Volkswagen's engine compartment and cab. Hornbecker does not challenge these findings, to which we owe deference. See United States v. Bunnell, 280 F.3d 46, 48-49 (1st Cir. 2002).  Nor does he argue that the opening of the gas port was an unlawful search.[2]

---

[2]We train our focus on these three penetrations of interior vehicular spaces because Hornbecker does not develop an argument that the troopers' other conduct between approximately 8:11 p.m. and

-9-

Finally, Hornbecker does not explain why, even if one or more of these searches was unlawful, we should order the suppression of evidence found over an hour later in the course of a different search.

We also reject Hornbecker's challenge to the district court's conclusion that no Fourth Amendment detention occurred between approximately 8:11 p.m. and approximately 8:20 p.m. To reiterate, the court found that Hornbecker was not detained (and thus not "seized") during this period because he was twice told that he was free to go but consented to stay and to comply with the troopers' various requests. Hornbecker's brief cites no authority discussing the line between de facto seizures and non-coercive police questioning. In any event, the court's ruling, to which we must once again defer, Bunnell, 280 F.3d at 48-49, is sustainable because Hornbecker was twice told that he was free to leave and twice asked whether he consented to searches that took place during the period in question. Although few people actually feel

---

approximately 8:20 p.m. constituted a search and the law points strongly in the other direction. See New York v. Class, 475 U.S. 106, 118 (1986) (areas inside automobile within plain view of persons on outside are not "subject to a reasonable expectation of privacy"); Texas v. Brown, 460 U.S. 730, 739-40 (1983) ("It is . . . beyond dispute that [the officer's] action in shining his flashlight to illuminate the interior of [defendant's] car trenched upon no right secured . . . by the Fourth Amendment.") (plurality opinion of four Justices; other five Justices concurring in the judgment and disagreeing on unrelated issues); id. at 740 ("Likewise, the fact that [the officer] changed his position and bent down at an angle so he could see what was inside [defendant's car] is irrelevant to Fourth Amendment analysis.") (brackets and internal quotation marks omitted); United States v. Muniz-Melchor, 894 F.2d 1430, 1433-36 (5th Cir. 1990) (tapping on exterior of large propane tank mounted in defendant's truck did not constitute a search); see also 1 Wayne R. LaFave, Search and Seizure, § 2.5(c) (1996) (indicating that examinations by natural senses of vehicular exteriors and vehicular contents do not constitute searches absent a physical intrusion into the vehicle).

-10-

free to walk away while being questioned by a police officer, the Fourth Amendment is not implicated unless, viewed objectively, the officer's conduct communicates an intention to use official authority to restrain the individual's freedom of movement. See United States v. Cardoza, 129 F.3d 6, 14-16 (1st Cir. 1997) (collecting cases). The court did not err in declining to find such a message in the troopers' words and conduct.

The success of Hornbecker's appeal thus depends on our determining that Rugen violated Hornbecker's Fourth Amendment right to be free from an unreasonable seizure by detaining him until 8:11 p.m. (approximately thirteen minutes into the stop) instead of turning him loose at or shortly after 8:02 p.m., when he learned that Hornbecker was not wanted and that Hornbecker's license and registration were valid. The district court seems to have upheld the detention during this period on the ground that, in Illinois, a legal traffic stop is never unlawfully protracted if it is concluded within 15 minutes. See p. 7, above. Hornbecker says that this all-or-nothing proposition is at odds with Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) (observing that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"). Because the government does not defend this basis for the court's ruling and because there exist narrower grounds to support the court's judgment, we do not address matters related to the Illinois 15-minute rule. See, e.g., United States v. Doe, 61 F.3d 107, 111-12 (1st Cir. 1995) (permitting affirmation of a district court's suppression ruling on any ground made manifest by the record).

Hornbecker and the government agree that Rugen detained Hornbecker between 8:02 p.m. and 8:11 p.m., and that the lawfulness of the detention is appropriately analyzed under the Terry line of cases. Hornbecker and the government also concur that, because most of the period between Rugen's request for the Volkswagen's papers and his completion of the written warning was attributable to Hornbecker's initial inability to locate the papers, whether Rugen lawfully detained Hornbecker during this period essentially depends on whether Rugen's request to inspect the papers was objectively reasonable under the circumstances. See, e.g., Ornelas v. United States, 517 U.S. 690, 695-697 (1996) (recognizing that the lawfulness of a detention, whether a Terry stop or a full custodial arrest, is determined by a fact-specific application of a legal standard designed to help courts assess whether the police action was objectively reasonable).[3]

Citing interests in regulating motor vehicles that travel the public highways and in deterring the trafficking of stolen vehicles, the government argues that, just as law enforcement officers may reasonably ask for a motorist's license and registration papers during a routine

---

[3]Judge Coffin's dissenting opinion can be read to suggest that, even if Rugen reasonably asked for the Volkswagen's paperwork, the detention of Hornbecker during the approximately three-minute period between Rugen's receipt of the paperwork and his issuance of the written warning was unreasonable because it was prompted by Rugen's desire that Graham complete the canine sniff. We respectfully disagree. By the time Hornbecker produced the Volkswagen's paperwork, Rugen's initial suspicion had been bolstered by Hornbecker's misleading answer about the space behind the cab and Graham's indication to Rugen that another trooper had recently discovered hidden contraband under similar circumstances. See, p.4, above. We think these additional grounds for suspicion gave Rugen justification to extend the detention long enough to permit Graham to complete his walk-around.

traffic stop, they may also always reasonably ask for the registration or ownership papers of a vehicle being towed.  Alternatively, the government contends that Rugen's request to see the Volkswagen's papers was reasonable under the particular facts of this case.  Hornbecker disagrees that the police may always ask to see papers pertaining to a towed vehicle, pointing out that a motorist need not even possess the papers of such a vehicle because it is not being driven.  And he resists the government's case-specific argument by arguing that Rugen lacked a reasonable suspicion that the Volkswagen was an instrument of illegal activity.  We do not resolve the broader dispute because, in the context presented, Rugen's request to see the Volkswagen's papers was reasonable.[4]

We acknowledge at the outset that, although the district court did not explicitly consider whether the request to see the Volkswagen's papers was reasonable in context, our conclusion that it was may conflict with the court's dicta that Rugen had no basis to detain Hornbecker for reasons unrelated to the traffic stop. After all, the request came after Rugen learned that there was no outstanding warrant for Hornbecker and that Hornbecker's license and registration were valid; it thus prolonged the detention beyond the point at which

---

[4]In his testimony at the suppression hearing, Rugen indicated that he was proceeding on the assumption that, during a routine traffic stop, he always may ask to see the papers of a vehicle being towed.  Of course, whether Rugen's subjective understanding was correct does not inform the Fourth Amendment inquiry.  What matters is whether Rugen's request was objectively reasonable under the circumstances.  See Whren v. United States, 517 U.S. 806, 809-19 (1996).  For this same reason, it is immaterial whether Rugen subjectively believed that he had grounds to detain Hornbecker between 8:02 p.m. and 8:11 p.m. for a reason other than his belief that he always is entitled to ask for the papers of a vehicle being towed.

it might otherwise be expected to have concluded.[5]  But we are obliged in these circumstances to reach our own, independent judgment about the reasonableness of the request.  Ornelas, 517 U.S. at 697-98 (holding that ultimate determinations of reasonable suspicion are subject to independent appellate review).

In assessing the reasonableness of Rugen's request, we "must balance the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion."  United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) (citations and internal quotation marks omitted), cert. denied, 534 U.S. 1150 (2002); see also United States v. Stanley, 915 F.2d 54, 55 (1st Cir. 1990) (Terry stops "must be justified by reasonable suspicion proportional to the degree of intrusion").  Keeping the balance true requires "a practical, commonsense judgment based on the idiosyncracies of the case at hand" and an assessment whether the officer's actions "were fairly responsive to the emerging tableau."  Chhien, 266 F.3d at 6 (citations omitted).  It also requires "deference . . . to the experienced perceptions of the officers," United States v. Woodrum, 202 F.3d 1, 7 (1st Cir.), cert. denied, 531 U.S. 1035 (2000), because factual circumstances that seem innocuous to a layman might well appear suspicious (and reasonably so) to the seasoned eye of law enforcement professionals, see Ornelas, 517 U.S. at 700 ("To a layman the sort of loose panel below the back seat armrest in the automobile involved in this case may suggest only wear and tear, but to [the officer], who had

---

[5]This is the premise of Hornbecker's argument regarding the 8:02 p.m. to 8:11 p.m. time frame and we assume its validity arguendo for purposes of our analysis.

-14-

searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel.").

Guided by these principles, we conclude that Rugen's request to see the Volkswagen's papers was lawful. In our view, continuing the detention of an already lawfully seized motorist for the short period of time that it typically takes to locate and produce vehicle registration or ownership papers (even if the papers are contained within a vehicle being towed and thus not within immediate reach) is a relatively slight intrusion on Fourth Amendment interests. Consequently, in assessing whether, as of 8:02 p.m., the facts gave Rugen "a particularized and objective basis for suspecting [Hornbecker] of criminal activity," Ornelas, 517 U.S. at 696 (describing the "reasonable suspicion" required to justify a Terry stop) (citation and internal quotation marks omitted), we are somewhat less demanding than we would be if we were evaluating the lawfulness of a Terry stop that resembled a full, custodial arrest, see, e.g., Chhien, 266 F.3d at 6 (recognizing that the inquiry into whether the facts adequately supported a Terry stop is informed by the nature and quality of the intrusion); Stanley, 915 F.2d at 55 (similar); cf. United States v. Finke, 85 F.3d 1275, 1280 (7th Cir. 1996) (concluding, in a case challenging an officer's continuation of a traffic stop in order to conduct a criminal history check on the motorist, that less than overwhelming grounds for suspecting the motorist of drug trafficking were nonetheless sufficient to warrant the brief period of extra detention required to conduct the check).

When all is said and done, the facts here were sufficient to satisfy the demands of <u>Terry</u>. Certainly, Rugen reasonably suspected that Hornbecker was lying when he stated that he was towing the Volkswagen from California to New Hampshire to sell it. One does not need to have expertise in the value of vintage automobiles (and Rugen admitted at the suppression hearing that he had no such expertise) to wonder how such a trek to sell a vehicle seemingly worth no more than a few thousand dollars[6] could be cost effective. And once Rugen reasonably suspected that Hornbecker was lying about the purpose of his trip, the evidence that Hornbecker hailed from a known drug source area and was hauling an unusual vehicle with a voluminous, inaccessible cavern inside its body structure justified Rugen's brief continuation of the detention while Hornbecker attempted to produce the Volkswagen's paperwork (especially when we factor in the deference we owe to Rugen's training and experience).[7] <u>Cf.</u> <u>United States</u> v. <u>Sowers</u>, 136 F.3d 24, 27-28 (1st Cir. 1998) (passenger's lack of identification papers, nervousness of driver and passenger, and fact that driver and passenger told conflicting stories sufficient to prolong their detention);

---

[6]There was evidence that Hornbecker had purchased the truck not long before for $2200.

[7]Hornbecker argues that the request for paperwork was a pretext designed to delay the detention until a drug-sniffing dog could be brought to the scene. Whether or not he is correct, his argument is beside the point. So long as the request could help confirm or dispel suspicions reasonably raised by Hornbecker's doubtful explanation for his trip in the mind of an objectively reasonable law enforcement agent, Rugen's actual purpose in making the request does not matter. <u>See</u> <u>Whren</u>, 517 U.S. at 809-19. Here, a reasonable officer might have asked to see the paperwork because the absence of such paperwork would make the proffered explanation for the trip even more suspicious. After all, a private sale of an automobile usually involves a transfer of ownership documentation.

<u>Stanley</u>, 915 F.2d at 56-57 (fact that defendant was alone in car late after midnight in area frequently used for illegal drug activities, was leaning over the vehicle's illuminated center console, and appeared to try to hide something when he saw officer sufficient to warrant the person's detention).

### III.  Conclusion

We agree with Judge Coffin that this is a close case  and appreciate especially his forceful and eloquent admonition that the lawfulness of contested searches and seizures be assessed realistically and holistically.  And we are not blind to the fact that the troopers, and especially Trooper Rugen, may well have manipulated Hornbecker into relinquishing Fourth Amendment rights by means of ingratiating conversation and insincere friendliness.  But so long as manipulative behavior does not cause us to question whether the relinquishment was in fact voluntary (e.g., an abuse of office such as the actual or threatened use of force), it is "reasonable" within the meaning of the Fourth Amendment.  <u>See</u> <u>Schneckloth</u> v. <u>Bustamonte</u>, 412 U.S. 218, 222-27 (1972).  As a general matter, insincere friendliness which successfully induces a criminal suspect to willingly answer questions and/or consent to a search does not, without more, cause us to question whether the suspect's response is "voluntary."  <u>Cf.</u> <u>id.</u> at 226 (listing factors typically bearing on the factual "voluntariness" inquiry).  Such behavior  is  thus  not  constitutionally  offensive.

For the reasons we have stated, we do not believe that Hornbecker's Fourth Amendment rights were violated in connection with

-17-

the search that led to the discovery.  We therefore affirm his conviction and sentence.

**<u>Affirmed.</u>**


          **<u>Dissent follows.</u>**

**COFFIN, <u>Senior Circuit Judge</u> (Dissenting).** I write separately to indicate my unease at the enhanced opportunity permitted by the court's approach for stretching the limits of both <u>Terry</u> stops and consents to limited search under escalating pressures. Reviewing all the circumstances of this case, I find that each step in the investigative process was precariously close to the constitutional line and that the totality of these close calls points to impermissible excess.

The initial stop, for exceeding the speed limit and having a cracked windshield, is not at issue here. The first close call is the court's holding that Trooper Rugen was justified in requesting that appellant procure registration or ownership papers for the Volkswagen, despite the fact that two minutes earlier, at 8:00 p.m., he had received word that appellant's license was valid and that there were no outstanding warrants and no criminal history. Without an objectively reasonable suspicion, the detention would have been invalid. The objectively reasonable basis, the court decides, was the unlikelihood of a thirty-year-old Volkswagen pickup truck being worth the cost of being towed across the United States for sale in New Hampshire, the fact that southern California was known as a source for drugs, and Rugen's curiosity about the space behind the cab. The court so finds despite Rugen's testimony that he had no reasonable suspicion at the time he ordered a canine search at 8:00 p.m. and the district court's statement that, as of 8:11 p.m., "the police had plenty of curiosity but no 'articulable suspicion.'"

If this detention falls within permissible limits, its justification is at best marginal. To elevate Rugen's vague hunches to the level of a particularized or articulable suspicion of criminal activity is a stretch.

Next is Trooper Rugen's admitted delay in finishing his paperwork in order to allow the dog to complete its walk. Rugen asked no fewer than fifteen questions of appellant during this delay, which he characterized as "just making conversation." See United States v. Pruitt, 174 F.3d 1215, 1221 (11th Cir. 1999) (irrelevant "'fishing expedition'" questions violated Terry). It was not until 8:11 p.m., after the canine had finished its walk and eleven minutes after Rugen had received clearance on appellant, that Rugen handed appellant his license and registration and said he was "free to leave."

Yet just three seconds after giving him clearance to leave, Trooper Rugen asked if appellant "would mind" if he looked at the engine compartment. I suspect that the close coupling of permission to leave with an ingratiating request to inspect ("I have never seen a truck like that before . . . . 'Course I'm only 31 years old."), in the presence of two eager troopers and the dog, throws doubt on the voluntariness of any manifestation of consent, but appellant has not expressly raised voluntariness of his consent as an issue before us.

Nevertheless, appellant's contention that the searches exceeded the scope of consent raises several concerns. To start with, there is difficulty with the search of the "engine

-20-

compartment." The court has described the troopers' resort to a screwdriver and their look inside the compartment immediately after appellant's affirmative answer to the "do you mind" request. The consented-to search of the engine compartment extended beyond the clearly delineated engine compartment to include prodding, tapping, banging, stepping up and crouching down, and even opening the Volkswagen's side panels. Trooper Rugen justified his extended search by contending that he was unclear as to the precise location of the engine compartment. Regardless of whether this professed confusion was objectively reasonable, he failed to clarify what area he had been given consent to search. Under these circumstances, at a minimum, "the scope of [appellant's] consent was ambiguous – an ambiguity that could have been but was not clarified by further inquiry." United States v. Infante-Ruiz, 13 F.3d 498, 505 (1st Cir. 1994).

Within two minutes of appellant's consent to search "the engine compartment," Rugen asked if he could look in the Volkswagen's cab. As the court reports, the answer was inaudible. The court states that "the videotape suggests that Hornbecker consented." I assume that this means that appellant did not protest.

At this point, after playing fast and loose with the first limited consent, then displaying forceful determination to continue the job and following with another request to examine a specific place, should not the officers have paused to make sure that consent was forthcoming and unequivocal? I fear that the court's

-21-

opinion will serve to encourage scenarios of familiarity leading to limited consent, followed by a sequence of escalating intrusions resulting in an abandonment of any limits to the scope of a search, all sanitized by continuing to infer consent.

As if all this were not enough, Rugen admitted that after finding nothing suspicious in the consented-to search of the cab, he began to move around the vehicle more. Rugen then requested that appellant open the gas port, admitting at trial that he was not asking permission. Appellant indicated that a screwdriver could be used here, too. This viewing at last yielded something -- the realization that neither the engine nor the gas tank occupied the space that in Rugen's mind, apparently, appellant had been questioned about.

The search for a principled basis for decision in such a case as this is made complex by the fact-specific issue of reasonableness underlying the Fourth Amendment. But I find a benchmark in comparing this case with two of our automobile investigative stop cases, relied on heavily by the government, United States v. Chhien, 266 F.3d 1 (1st Cir. 2001), and United States v. Sowers, 136 F.3d 24 (1st Cir. 1998). In Chhien, the sequence of events began with the customary traffic violation, then a consensual pat-down yielding a large wad of money, leading to a few questions and inconsistent answers, followed by suspicious movements of a passenger in the car, refusal to open a clenched fist, and, finally, when the passenger was removed from the car, contraband in plain view. Chhien, 266 F.3d at 4-5. In Sowers,

-22-

there were signs of nervous behavior at the start, substantial discrepancies in answers to simple travel questions, a written consent to search, and a pat-down yielding a package of contraband. Sowers, 136 F.3d at 25-26.

Those cases seem to me soundly decided, but debatable. If they are at or near the line, this one is well beyond it. This is a case where each discrete act of the troopers, if looked at through a narrow lens, may pass muster. But how many such close calls may be made without tainting the final decision? Is it enough to say that a straw is just a straw without worrying when one more straw will break the camel's back? I am left with a profound feeling that in this case the officers "pushed the envelope" too far and that our affirming the district court could be interpreted as an Open Sesame to law enforcement to prolong Terry stops, require irrelevant information and documents, establish an atmosphere of coziness that ultimately suffocates an individual's freedom to choose, ask for limited permission to search, and then subtly overreach its scope and interpret coerced acquiescence as implied consent.

I therefore would reverse the judgment of the district court and order that it suppress the drugs found in the Volkswagen.