UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States of America

    v.                       Criminal No. 18-cr-132-JD
                                Opinion No. 2021 DNH 027

Laveneur Jackson

O R D E R

Defendant Laveneur Jackson moves to suppress all evidence and statements obtained by the government resulting from a January 2, 2017, encounter at Riley's Sport Shop in Hooksett, New Hampshire.  Doc. 98.  Jackson also filed a "Supplement to Motion to Suppress" (doc. no. 115), in which he argues that the government failed to timely obtain a warrant for two cell phones seized during the encounter.[1]  The government objects to Jackson's motion to suppress but states that it will not use any evidence obtained from Jackson's cell phones.  The court held an evidentiary hearing by videoconference on the motion to suppress on January 19, 2021.

---

[1] Jackson filed the motion to suppress and supplement to the motion to suppress pro se.  Subsequently, on Jackson's request to end his pro se status, the court appointed Attorney Simon Brown to represent Jackson.  Attorney Brown represented Jackson during the January 19 evidentiary hearing.

Background

Jackson is charged with two counts of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g).[2]  He has pleaded not guilty.

The court finds the following facts based on the testimony and evidence presented during the January 19, 2021, videoconference evidentiary hearing.[3]  During the hearing, ATF Task Force Officer Matthew Barter, ATF Special Agent John Cook, and Hooksett Police Department Officer Kristofer Dupuis testified.  The court also accepted into evidence two audio recordings of voicemails left by Jackson.  The court has considered Jackson's affidavit (doc. no. 98-1), which he submitted pro se with his motion to suppress, but the affidavit

---

[2] At the time Jackson filed the motion to suppress, he was also charged with two counts of aiding and abetting the making of a material false statement in connection with the purchase of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). The government moved to dismiss those two charges on December 3, 2020.  The court dismissed both counts with prejudice.

[3] The court is authorized to conduct evidentiary hearings by videoconference pursuant to the CARES Act and the District of New Hampshire's standing administrative orders relating to the ongoing COVID-19 pandemic.  See Order Extending CARES Act Authorization, ADM-1, Order 20-35 (Dec. 8, 2020); see also United States v. Rosenschein, 474 F. Supp. 3d 1203, 1206-10 (D.N.M. 2020) (rejecting defendant's several procedural and constitutional arguments against holding a pretrial suppression hearing by videoconference); United States v. Gonzalez-McFarlane, 2020 WL 6262968, at *2 (D.V.I. Oct. 24, 2020) (finding that CARES Act authorizes conducting evidentiary hearings for motions to suppress by videoconference).

is given minimal weight because Jackson did not testify during the suppression hearing and therefore was not subject to cross-examination on the contents of the affidavit. See United States v. Reyes, 2018 WL 1704781, at *1 n.1 (D. Mass. Apr. 9, 2018).

A.    Tip from Riley's Sport Shop Employee

Officer Barter testified that, on January 2, 2017, an employee at Riley's Sport Shop, a federally licensed firearms dealer in Hooksett, New Hampshire, called the ATF and spoke to him. The employee reported to Officer Barter his concern that a woman – whom the employee identified as Angelina Keenan – was engaging in a straw purchase. Officer Barter was familiar with the Riley's employee because the employee had participated in informal ATF training on straw purchases and had previously provided reliable tips to Officer Barter.

During the phone call, the employee relayed to Officer Barter the grounds for his concern. A few days earlier, on December 27, 2016, Keenan had purchased two firearms from Riley's. On December 27, Keenan had arrived with a then-unidentified man who appeared to be pointing out firearms to Keenan and closely monitoring the purchase.

On January 2, Keenan was at Riley's again looking to purchase firearms of the same make, model, and caliber that she had bought on December 27. According to the reporting employee,

the same man was also with Keenan, and, as with the December 27 purchase, Keenan was consulting with him.  The employee also told Officer Barter that Keenan and two men had arrived in a blue Audi and that Keenan had gone to and from the store and car several times.  The employee provided Officer Barter with the car's license plate number.[4]

Based on that information, Officer Barter drove to Riley's Sport Shop.  Officer Barter contacted Agent Cook, who also responded to the store.  When he arrived, Agent Cook entered the store to speak with the reporting employee and potentially make contact with Keenan, while Officer Barter watched a blue Audi that matched the description and license plate number provided by the Riley's employee.  Shortly after Agent Cook went inside the store, Keenan and a white male, later identified as Benjamin Soule-Jensen, left the car and walked into the store.  Another man, later identified as Jackson, remained in the rear passenger side seat of the blue Audi.

Agent Cook testified that, inside the store, he spoke with the employee who had called Officer Barter to report his suspicions about a straw purchase.  The reporting employee told Agent Cook that a second employee had relayed the information about Keenan's behavior.  The reporting employee told Agent Cook

_____

[4] Agent Cook testified that another Riley's employee went to the parking lot to obtain the car's license plate number.

4

that Keenan and an unidentified black male had been in the store recently, that the man had handled firearms, and that he had directed Keenan through the process of purchasing the firearms. The man, however, did not purchase anything himself. The reporting employee also told Agent Cook that Keenan appeared sick and that she kept going to the bathroom as well as back and forth to the car.

Agent Cook saw Keenan and Soule-Jensen enter the store. Hoping to stop Keenan and to question her about the suspected straw purchases, Agent Cook, who was wearing plain clothes, followed Keenan and Soule-Jensen. Agent Cook testified that he saw Keenan and Soule-Jensen leave and stop on a wheelchair ramp in front of the store, apparently to smoke cigarettes. Agent Cook walked by them and overheard Keenan ask, "Is he going to pay a hundred dollars per each?" to which Soule-Jensen responded, "one hundred dollars per." Agent Cook then went to Officer Barter's unmarked car, which was parked near the blue Audi.

B. Stop & Questioning

Agent Cook and Officer Barter decided to stop Keenan, Soule-Jensen, and Jackson based on their suspicion that they were involved with the illegal straw purchase of firearms. Officer Barter put on a police jacket, and both he and Officer

5

Barter displayed police badges.  Officer Barter had a holstered firearm on his belt alongside handcuffs.  Officer Barter and Agent Cook also called for a marked police cruiser as backup.

Agent Cook stopped Keenan and Soule-Jensen before they arrived at the car, while Officer Barter approached Jackson, who was sitting in the rear passenger seat.  Officer Barter asked Jackson to exit the car.  Agent Cook and Officer Barter frisked Jackson, Keenan, and Soule-Jensen for weapons.  At around the same time, Officer Dupuis arrived in a marked patrol cruiser, which he parked in a way that did not block the blue Audi from leaving.[5]

Away from Jackson and Soule-Jensen, Agent Cook interviewed Keenan.  Keenan initially told Agent Cook that she was purchasing firearms for herself, but Agent Cook testified that he believed she was lying based on her demeanor.  After Agent Cook "forcefully" told her that lying to a federal officer is a felony offense, Keenan told Agent Cook that she was purchasing a firearm for Jackson and that she had purchased three firearms for him previously.  Keenan told Agent Cook that Jackson was going to pay her $100 for attempting to purchase the guns.

---

[5] The court finds credible Agent Cook's and Officer Barter's testimony that the cruiser was not parked in a way that blocked the blue Audi from leaving.  Officer Dupuis testified that he did not remember where he parked the cruiser, but indicated that he did not believe that he blocked the Audi.

6

Keenan added that, as partial payment for completing the purchase, Jackson was to give her one of the firearms.

Keenan also told Agent Cook that she had overheard Jackson talking to other people on his cell phone about the firearms. Keenan admitted to habitual drug use and added that Jackson had sold drugs to her on occasion.

Officer Barter testified that he briefly spoke with Jackson at about the same time Agent Cook interviewed Keenan. Jackson told Officer Barter that he had a prior felony conviction for drug sales. Jackson denied that Keenan was buying guns for him. Officer Barter collected identifying information from Jackson, such as his name, date of birth, and address, but ended the interview because he was not obtaining any information useful to the investigation. Officer Barter's interview of Jackson, which Barter testified was "conversational" in tone, lasted approximately five minutes.

After completing his interview with Keenan, Agent Cook approached Jackson, who was then standing by himself near the wheelchair ramp leading to the entrance to Riley's. Agent Cook asked Jackson if he was a convicted felon and told Jackson that he was in trouble because video from the store showed him handling firearms. Agent Cook told Jackson that he could help law enforcement by retrieving the firearms that Keenan had purchased.

Jackson told Agent Cook that the guns were in Massachusetts and said that he might be able to retrieve some of the firearms, but it might take some time. Agent Cook, however, told Jackson that he would need to work in conjunction with law enforcement to recover the firearms. Jackson was unwilling to work with law enforcement, and he then asked to talk with a lawyer. At this point, Agent Cook ended his questioning of Jackson, which Agent Cook described in his testimony as "casual" and which had lasted about two minutes before Jackson asked for an attorney.

Based on the information gathered, Agent Cook and Officer Barter decided to seize a cell phone that Jackson had placed on the roof of the Audi and another cell phone in the car that they could see and that Jackson had said was his. They provided Jackson with a receipt for the cell phones and, because Keenan had agreed to return with Agent Cook and Officer Barter to the Hooksett Police Department for a further interview, Agent Cook and Officer Barter told Jackson to leave the area so that he did not learn she was working with them.

Before leaving the area, however, Jackson asked Keenan to return $1,000 that he said she was holding for him. Agent Cook, who did not know what Jackson was talking about, asked Keenan whether she was holding the money Jackson had requested, and Keenan produced $1,000 in cash. Keenan remarked that Jackson gave her the money to buy the firearms and that $100 of it was

8

her payment for completing the firearms purchase. Agent Cook and Officer Barter took the money. Jackson then left the area on foot. Approximately forty-five minutes elapsed between the time Officer Barter and Agent Cook arrived at Riley's and the time Jackson left.

The next day, January 3, Jackson called the ATF several times. He spoke with Officer Barter and requested the return of the money and cell phones. He made another call and spoke with Agent Cook and made the same request. Jackson also left two voicemails which were entered into evidence. In addition, Jackson went to the ATF office and requested that Agent Cook return the cell phones and money. Jackson told Agent Cook that he had a lawyer, to which Agent Cook responded that Jackson's lawyer should be the one contacting the ATF. The ATF did not return the money or Jackson's cell phones.

## Discussion

Jackson argues that the court must suppress all evidence and statements obtained by the government resulting from the January 2, 2017, stop at Riley's. He asserts that the Agent Cook and Officer Barter lacked reasonable suspicion to stop and question him about the suspected straw purchases. Jackson additionally contends that any statements he made during the stop on January 2 should be suppressed because he was not warned

9

of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and because his statements were coerced.  In his supplement to his motion to suppress, Jackson adds that the court should suppress any evidence obtained from the cell phones seized by the government, and, at the evidentiary hearing, Jackson argued that the court should suppress the $1,000 in seized cash and any evidence obtained therefrom.  The government objects to suppression except as to the cell phones.  Jackson filed a reply, and the government filed a surreply.[6]

A.    Reasonable Suspicion for January 2, 2017, Stop

Jackson contends that Agent Cook and Officer Barter did not have reasonable suspicion to stop and question him on January 2, 2017.  The government objects, arguing that the officers had reasonable suspicion to stop Jackson and question him about the suspected straw purchase of firearms based on the tip provided

---

[6] In his reply to the government's objection, Jackson argues that the government's objection was untimely.  He contends that his motion to suppress was served on April 10, 2020, making the government's objection due fourteen days later on April 24.  See Crim. LR 14.1.  The government's objection was not filed until April 27.  In its surreply, the government argues that its objection was timely under Federal Rules of Criminal Procedure 45 and 49.  Under Rules 45(c) and 49(a)(4)(C), an additional three days for a response are provided when a motion is served by mail, as Jackson's motion to suppress was here.  Therefore, the government's objection was timely because it was filed on April 27, which was within seventeen days of service of Jackson's motion to suppress by mail.

10

by the Riley's Sport Shop employee and the subsequent information obtained by Agent Cook.

Under Terry v. Ohio, 392 U.S. 1 (1968), government agents "may stop and briefly detain an individual for investigative purposes" without violating the Fourth Amendment[7] "if [they] have a reasonable suspicion that criminal activity is afoot." United States v. Dapolito, 713 F.3d 141, 147 (1st Cir. 2013). The government agents must have reasonable suspicion for the initial stop, and any "subsequent actions are measured by the 'emerging tableau' of circumstances as the stop unfolds." United States v. Orth, 873 F.3d 349, 354 (1st Cir. 2017). Therefore, the focus of the stop may shift based on information obtained during the course of the original investigatory stop. Id.; see also United States v. Tanguay, 918 F.3d 1, 4-5 (1st Cir. 2019) (discussing reasonable responses by officer to emerging circumstances during Terry stop).

To have reasonable suspicion, the officer must have specific, articulable facts supporting the decision to stop a suspect. United States v. Am, 564 F.3d 25, 29-30 (1st Cir. 2009). In determining whether reasonable suspicion exists, the

---

[7] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.

court must make "a practical, commonsense judgment" considering the idiosyncrasies of the case. United States v. Hornbecker, 316 F.3d 40, 47 (1st Cir. 2003). Furthermore, "the focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." United States v. Barnes, 506 F.3d 58, 62-63 (1st Cir. 2007).

Based on the information they gathered before stopping Jackson, Agent Cook and Officer Barter had reasonable suspicion that an illegal straw purchase of firearms was occurring at Riley's Sport Shop on January 2, 2017, and that Jackson was involved. The Riley's employee described to Officer Barter and Agent Cook multiple circumstances that, considered together, were consistent with a straw purchase. Agent Cook testified that Keenan was attempting to buy two commonly-trafficked, inexpensive handguns and that she had very recently purchased two more of the same firearms from the store. Keenan appeared to have been guided through the transactions on both dates by another person, and she was going back and forth to the blue Audi during the sale. Prior to stopping Jackson, Agent Cook also overheard Keenan and Soule-Jensen discussing how much

Keenan would be paid for making the straw purchases.[8]  Taken together, these circumstances were sufficient to provide Officer Barter and Agent Cook with reasonable suspicion to stop and question Jackson about the suspected straw purchases.

Jackson argues that a man's direction of a woman through the purchase of a firearm is not unusual or at least not indicative of criminal activity.  See United States v. Siqueiros, No. CR 12-1839-TUC-RCC, 2013 WL 3282548, at *4 (D. Ariz. June 27, 2013) ("[S]tanding alone, there is nothing suspicious about a man helping a woman with the purchase of a firearm.").  Here, however, Jackson's assistance of Keenan does not stand alone.  While consultation on a purchase is not necessarily indicative of criminal activity, such consultation combined with repetitive purchases of multiples of the same inexpensive and commonly-trafficked firearm suggests straw purchases and the plausibility of an innocent explanation for those actions does not undercut grounds for reasonable suspicion.  See United States v. Wright, 582 F.3d 199, 213 (1st Cir. 2009) (stating that officers may make a stop based on reasonable suspicion "even if the conduct justifying the stop

_____

[8] Jackson contends that the conversation that Agent Cook overheard did not occur.  The court, however, finds Agent Cook's report of the conversation credible.  No evidence has been elicited casting doubt on Agent Cook's credibility or on his testimony about the conversation.

was ambiguous and susceptible of an innocent explanation" because "the very purpose of [such] stops is to clarify ambiguous situations").

Jackson contends that the tip from the Riley's employee was not sufficiently reliable to support Agent Cook's and Officer Barter's suspicion. The employee, however, did not call anonymously, and Agent Cook spoke to the employee in person, which enhances the reliability of the information. See Florida v. J.L., 529 U.S. 266, 270 (2000) (stating that a "tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" is more trustworthy than an anonymous tip). The employee was also known to both Agent Cook and Officer Barter from previous reports of suspicious firearm-purchasing activity and had previously provided reliable information. Furthermore, while the information from the reporting employee was secondhand, Agent Cook further investigated and corroborated the report before stopping Jackson. As noted, Agent Cook overheard a conversation between Keenan and Soule-Jensen that suggested that they were involved in a straw purchase and that a third person was involved. While it is true that Jackson was not specifically identified in the conversation, Jackson had arrived with the two individuals who were known to be involved, so further investigation of Jackson's potential involvement through

14

a Terry stop was a reasonable and logical expansion of the investigation given the emerging facts.

Considering all the circumstances, it was reasonable for the officers to address Jackson's involvement in the suspected straw purchase by stopping and questioning him. Once the stop occurred, the emerging facts justified continuing the stop, as both Keenan and Jackson made incriminating statements about their involvement. For these reasons, Jackson's motion to suppress is denied as to his contention that the Terry stop was not supported by reasonable suspicion.

B. Custodial Interrogation

Jackson also argues that his statements made on January 2, as well as any evidence discovered because of his statements on January 2, should be suppressed because he was interrogated while in custody but was not provided the warnings as provided in Miranda. In support of his contention that he was in custody, Jackson asserts that he was blocked by a police cruiser, that he was subjected to a pat frisk, that his identification was confiscated, and that he was told to remain where he was by uniformed officers. Jackson also stresses that during the interrogation he was told that he was in legal trouble and confronted with false evidence of his guilt. The

15

government argues that the totality of the circumstances show that Jackson was not in custody.

The exclusion of incriminating statements obtained during a "custodial interrogation" is required unless the Fifth Amendment privilege against self-incrimination was waived after a suitable warning of the right to remain silent and the consequences of failing to assert that right. United States v. Campbell, 741 F.3d 251, 265 (1st Cir. 2013). Whether a person is in custody during an interrogation is determined through an objective, two-step test. United States v. Melo, 954 F.3d 334, 339-40 (1st Cir. 2020).

At the first step, the court asks whether, given the objective circumstances of the interrogation, "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." Id. (alterations and quotation marks omitted). In assessing the first step, the court looks to the following, non-exhaustive list of factors: (1) whether the questioning occurred "in familiar or at least neutral surroundings"; (2) "the number of law enforcement officers present at the scene"; (3) "the degree of physical restraint placed" on the individual; and (4) "the duration and character of the interrogation." Campbell, 741 F.3d at 266. At the second step, the court asks "whether the relevant environment presents the same inherently coercive pressures as the type of

16

station house questioning at issue in Miranda." Melo, 954 F.3d at 340.

The questioning occurred in a neutral location, a parking lot where Jackson had arrived on his own volition. Although Jackson was not familiar with the area, an open parking lot is distinguishable from a jailhouse interrogation that traditionally requires Miranda warnings. See Campbell, 741 F.3d at 267 ("The defendants were questioned in a neutral location, a hotel parking lot."); United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) ("Although the location apparently was not familiar to [the defendant] and the area was not well-lit, a public highway is a neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse.").

The number of law enforcement officers at the scene was not excessive. Although there were three officers at the scene, the officers split up, did not crowd Jackson, and Jackson was questioned by only one officer at a time. See Campbell, 741 F.3d at 267 ("The police officers split up and questioned the defendants separately, such that each defendant was questioned by at most two officers. There is no indication that this police-to-suspects ratio was overwhelming to the defendants.").

Neither Jackson nor his companions were placed in physical restraints, and the officers did not draw their weapons.

17

Jackson argues that Audi was blocked by a police cruiser, which left him unable to leave. The testimony from Agent Cook, Officer Barter, and Officer Dupuis, however, was consistent in that the cruiser was parked away from and was not blocking the Audi. In any event, even under Jackson's version of events, it was the Audi that was blocked by the cruiser; Jackson himself was never physically restrained. Furthermore, Keenan and Soule-Jensen drove Jackson to Riley's Sport Shop and the Audi was not his car.[9] Jackson was later able to leave the scene on foot after he terminated the questioning by requesting a lawyer.

Neither the duration nor the character of the questioning suggests that Jackson was in custody. Although Jackson was stopped, questioned, and confronted with evidence tending to show his involvement in suspected criminal activity, a Terry stop on its own does not create a custodial atmosphere even though it can be inherently coercive to some degree. See Stansbury v. California, 511 U.S. 318, 325 (1994) ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."); United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001) (stating that a Terry stop

_____

[9] Testimony at the hearing indicated that the car was owned by a relative of Benjamin Soule-Jensen.

18

usually does "not implicate the requirements of Miranda because Terry stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates Miranda warnings").  Likewise, although the officers frisked Jackson, the stop called for a weapons frisk because the suspected crime involved firearms.  The officers' check of Jackson's identification is consistent with the nature of a Terry stop and does not transform the encounter into a custodial interrogation.  Cf. Tanguay, 918 F.3d at 5 (noting that officers are generally permitted to ask a person for their identification even without any basis for suspecting that the person has committed a crime).

The stop lasted, in total, only about forty-five minutes, which was not an inordinate length of time under the circumstances.  See United States v. Hughes, 640 F.3d 428, 437 (1st Cir. 2011) (characterizing ninety-minute interview as "relatively short").  The interviews themselves were even shorter, as Officer Barter testified that he only questioned Jackson for about five minutes and Agent Cook testified that he only questioned Jackson for two minutes.  Jackson also exercised control over the length of the questioning, as it was terminated after he requested a lawyer.  These factors weigh strongly against a finding of custodial interrogation.

Jackson was not in custody during the January 2, 2017, Terry stop and questioning at Riley's Sport Shop. None of the factors enumerated in Campbell weigh in Jackson's favor. Considering the objective circumstances, a reasonable person would have felt that he was at liberty to terminate the questioning and leave. Therefore, Jackson's motion to suppress any incriminating statements he made or evidence the government obtained as a result of incriminating statements he made without Miranda warnings is denied.

## C.    Coerced Statements

In addition, Jackson argues that his statements to law enforcement officers on January 2 were coerced or involuntary and should be suppressed for that reason. He concedes that his statements to law enforcement officers on January 3 – when he called the ATF requesting return of his cell phones – were not coerced, but he argues that they should be suppressed as stemming from the coerced statements on January 2. The government argues that Jackson's statements were not coerced.

The government may not use an involuntary or coerced statement against a defendant at trial. United States v. Hufstetler, 782 F.3d 19, 21 (1st Cir. 2015). Similar to determining whether Miranda warnings are necessary, in assessing the voluntary nature of a statement the court examines the

20

totality of the circumstances.  See United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011).  The "lynchpin" of the analysis "is whether the government's conduct overtook the will of the defendant."  Hufstetler, 782 F.3d at 22.  The factors for the court to consider include the length and nature of the questioning, whether investigators threatened the defendant, or whether investigators deprived the defendant of his essential needs.  Id.; Hughes, 640 F.3d at 438.

The same circumstances and facts that show that Jackson was not in custody on January 2 establish that his statements were not involuntary or coerced.  Jackson was questioned by officers in an open parking lot pursuant to a lawful Terry stop justified by reasonable suspicion.  Although the officers frisked Jackson, ran his identification,[10] and stopped him for approximately forty-five minutes and questioned him briefly, Jackson was never physically restrained.  Jackson was not deprived of his essential needs.  During the brief questioning, Jackson was told he faced the possibility of jail time, but very soon thereafter, when discussions occurred about working with law enforcement, Jackson asked for a lawyer, the questioning immediately ended, and Jackson left.  For those reasons, Jackson's statements on January 2 were not coerced.  See Hughes, 640 F.3d at 438.

---

[10] In his affidavit, Jackson states that his identification was returned to him before he left.  Doc. 98-1 ¶ 21.

21

Therefore, Jackson's statements on January 3 did not result from any unlawful coercion on January 2.

D.    Search Warrant for Cell Phones

In his supplement to his motion to suppress, Jackson asserts that the government took too long to obtain a warrant to search the cell phones that Officer Barter and Agent Cook seized during the January 2, 2017, stop.  The government did not object to Jackson's supplement and instead stated that it will not introduce evidence obtained from the cell phones at trial.  Doc. 124.  Accordingly, Jackson's motion to suppress is granted as to the cell phones.  Any evidence obtained from the cell phones will not be admitted at trial.

E.  Seizure of Money

At the evidentiary hearing, Jackson briefly argued that, on January 2, 2017, Officer Barter and Agent Cook seized $1,000 from him unlawfully.  Government agents may seize an item without a warrant "if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." United States v. Hernandez-Mieses, 931 F.3d 134, 140 (1st Cir. 2019).  Officer Barter and Agent Cook's seizure of the money was supported by

probable cause, it was clearly visible to the officers once Keenan voluntarily produced it, and the officers had a lawful right to access the money. Specifically, the officers had probable cause to seize the money because of Jackson's and Keenan's earlier statements about their involvement in illegal straw purchases of firearms, as well as Keenan's statement that Jackson had given her the money to buy the firearms and that $100 of it was to be used as her payment. For those reasons, Jackson's motion to suppress is denied as to the $1,000 in cash.

## Conclusion

For the foregoing reasons, Jackson's motion to suppress (doc. nos. 98, 115) is denied except as to any evidence obtained from the cell phones seized on January 2, 2017. The motion to suppress is granted solely as to the cell phones seized on January 2, 2017.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

January 29, 2021
cc:  Simon R. Brown, Esq.
      Anna Z. Krasinski, Esq.
      Seth R. Aframe, Esq.
      U.S. Marshal
      U.S. Probation