# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1299

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| William James Crippen, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 22, 2010
Filed:  December 20, 2010

_____

Before SHEPHERD, BRIGHT, and ARNOLD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

William Crippen was convicted of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 841(b)(1)(C), and conspiracy to tamper with a witness in violation of 18 U.S.C. § 1512(b)(2)(A). The district court[1] sentenced him to 180 months imprisonment. Crippen appeals the district court's denial of his motion to suppress evidence, the district court's denial of his motions in limine, the

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

sufficiency of the evidence to support his convictions, and the district court's sentencing decision. We affirm.

I.

The conspiracy to manufacture methamphetamine at issue in this case involves conduct spanning a period of two years. In late 2007, Guy Conroy and William Stibbs began manufacturing methamphetamine at Conroy's house. In return for finished methamphetamine, Crippen supplied pseudoephedrine pills to Conroy and Stibbs on multiple occasions. In October 2008, the police executed a search warrant at Conroy's house and discovered ingredients and equipment used in manufacturing methamphetamine. The officers also discovered Crippen, who was arrested for possession of methamphetamine. Upon questioning at the police station, Crippen denied any involvement in the operation and explained that he had come to Conroy's house to go fishing. As a result of the search, Stibbs was charged federally and incarcerated, and Conroy was charged in Iowa state court and released pending trial. The specific charges against Crippen are not clear from the record, but he was apparently released.

After the October 2008 search, Crippen and Troy Daniels began cooking methamphetamine. Conroy became involved again while awaiting trial when Crippen and Daniels asked him if they could use his house for part of the manufacturing process. The three men worked together to obtain the ingredients necessary for manufacturing methamphetamine. They obtained pseudoephedrine pills by either purchasing them or asking others to purchase them, obtained anhydrous ammonia by stealing it from tanks on farms and co-ops, and obtained lithium batteries and other ingredients as needed.

In January 2009, Crippen was seated in the front passenger seat of a pickup truck driven by Daniels. When police officer Scott Palmer passed the truck, he

noticed Crippen was not wearing his seatbelt. Officer Palmer reversed the direction of his patrol car, and began to follow the truck. Officer Palmer observed Daniels pull into the parking lot of an apartment building, throw rubber tires into a dumpster, and exit the parking lot. Aware of previous trespass complaints at the apartment building, Officer Palmer contacted police dispatch and verified that the apartment manager had not recently given anyone permission to dump trash in the apartment building's dumpster.

Officer Palmer then followed the pickup truck outside city limits and initiated a traffic stop in a rural area. As he approached the vehicle, Officer Palmer recognized Daniels from previous trespass complaints at the apartment building and recognized Crippen from the October 2008 search of Conroy's home. When Daniels could not produce proof of insurance, Officer Palmer asked Daniels to exit the truck. For safety reasons, Office Palmer checked Daniels for weapons and placed him in the front seat of the patrol car to isolate him from Crippen. He then contacted police dispatch to determine whether Daniels was permitted on the apartment premises and learned that the apartment manager had allowed Daniels to stay there overnight. He concluded that he could not arrest Daniels for trespass, but he could issue a citation for failure to have proof of insurance to Daniels and a citation for failure to wear a seatbelt to Crippen.

Officer Palmer returned to the truck to issue the seatbelt citation to Crippen and noticed the curved top of a white coffee filter sticking out of Crippen's right coat pocket. Based on his training and experience in law enforcement, Officer Palmer knew coffee filters are often used in manufacturing methamphetamine. He also recalled that Crippen had been in possession of methamphetamine when officers found him at Conroy's house in October 2008.

After observing the coffee filter, Officer Palmer asked Crippen for his name, address, and social security number, then returned to his squad car to check on Daniels

and seek backup assistance. He went back to the truck and asked Crippen to exit the vehicle. After conducting a pat-down search of Crippen for weapons, Officer Palmer seized the coffee filters. When Officer Palmer asked Crippen about the filters, Crippen responded by asking what he could do to avoid being charged and admitting that drugs could be found on the driver's side of the vehicle.

Officer Palmer and Detective Tim Cook, who responded to Officer Palmer's request for backup assistance, searched the truck and discovered methamphetamine in plastic baggies under the seats; receipts from the purchase of pseudoephedrine; and a backpack with a digital scale, baggies, a tag from a propane tank, and a brass coupler. Daniels and Crippen were both arrested. It is not clear from the record whether Crippen was charged at this point, but he was apparently released. Daniels remained incarcerated, but he eventually agreed to cooperate with law enforcement to obtain evidence on Conroy and Crippen.

In February 2009, Daniels delivered pseudoephedrine pills to Conroy's house while wearing a recording device. After he arrived, Conroy had a telephone conversation with Crippen during which Crippen agreed to buy lithium batteries at Conroy's request and informed Conroy another individual had left three boxes of pseudoephedrine pills in Conroy's truck. A short time later, Crippen arrived at the house and walked out to the driveway to retrieve the pseudoephedrine pills from Conroy's truck.

With this information, law enforcement officers obtained a search warrant and entered Conroy's house. They found Conroy attempting to hide manufacturing paraphernalia in a hidden compartment in the living room closet with Crippen standing nearby. Officers seized lithium batteries; a pouch with snort tubes, a spoon, and a digital scale; coffee filters; a coffee grinder; and pseudoephedrine pills. Crippen was arrested and charged with conspiracy to manufacture and distribute methamphetamine and the manufacture and distribution of methamphetamine.

While Crippen was awaiting trial, he made frequent phone calls to his mother and others from the jail telephone. During these conversations, Crippen indicated that he wanted to prevent Daniels from testifying as a witness against him. Crippen, his mother, and others developed a plan to speak with Daniels and convince him to not appear in court. Several strategies were discussed, including asking Daniels to consider how long Crippen would be in jail if he testified, threatening Daniels and his wife, and physically harming Daniels. Based on these conversations, Crippen was also charged in a superseding indictment with conspiracy to tamper with a witness.

At trial, Crippen moved to suppress the evidence obtained during the traffic stop in January 2009. The district court granted the motion in part, ordering the exclusion of the incriminating statements made by Crippen and denied the motion in part, admitting the evidence seized from Crippen's coat pocket and the truck.

Crippen also filed motions in limine to exclude pseudoephedrine logs showing that Crippen had purchased pseudoephedrine pills, Crippen's prior convictions for conspiracy to manufacture methamphetamine and possession of ephedrine as a precursor, and recordings of phone calls made by Crippen to various individuals while he was incarcerated. The district court denied Crippen's motions in limine.

At the conclusion of the trial, the jury found Crippen guilty of conspiracy to manufacture 50 grams or less of a mixture and substance containing methamphetamine and conspiracy to tamper with a witness, and it acquitted Crippen on the charge of the manufacture or distribution of methamphetamine. Crippen moved for judgment of acquittal, but the district court denied his motion.

Based on Crippen's involvement in the conspiracy, the Presentence Investigation Report (PSR) recommended that Crippen be held responsible for 62 boxes of pseudoephedrine pills. Using a one-to-one ratio of pseudoephedrine boxes to grams of actual methamphetamine, the PSR calculated that the 62 boxes of

pseudoephedrine pills equaled 62 grams of actual methamphetamine. Accordingly, the PSR recommended the district court find a base offense level of 32 and a two-point adjustment for obstruction of justice, bringing his offense level to 34 under the Federal Sentencing Guidelines. In the alternative, the PSR recommended the district court find that Crippen qualified as a career offender, which also resulted in a base offense level of 34. The PSR further recommended the district court find that Crippen had a criminal history category of VI, resulting in an advisory sentencing range of 262 to 327 months of imprisonment.

At sentencing, the district court adopted the PSR's recommendation and found Crippen was responsible for 62 grams of actual methamphetamine. The district court also found that Crippen qualified as a career offender. With a base offense level of 34 and a criminal history category of VI, Crippen's advisory sentencing range was 262 to 327 months imprisonment. Based on consideration of the factors in 18 U.S.C. § 3553(a), the district court found Crippen's case justified a variance below the Guidelines range and imposed a sentence of 180 months imprisonment.

II.

Crippen raises four issues on appeal. We address each in turn.

A. Motion to Suppress

Crippen challenges the district court's denial of his motion to suppress the evidence seized from his person and from the truck during the January 2009 traffic stop. When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Johnson, 619 F.3d 910, 917 (8th Cir. 2010). We will affirm "unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite

conviction that a mistake has been made." United States v. Rodriguez-Hernandez, 353 F.3d 632, 635 (8th Cir. 2003).

Crippen first argues that the search of his person, which resulted in the seizure of the coffee filter, was an invalid pat-down search because it was not motivated by a fear that he was armed and dangerous. Crippen contends this is clear because Officer Palmer did not conduct the search when he initially observed the coffee filter in Crippen's pocket, instead conducting it only after requesting information from Crippen, walking back to his squad car, and returning to the truck a second time.

Police officers may perform a pat-down search of a driver and passengers upon reasonable suspicion that they may be armed and dangerous. United States v. Oliver, 550 F.3d 734, 737 (8th Cir. 2008), cert. denied, 130 S. Ct. 740 (2009). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 738 (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)). A suspicion on the part of police that a person is involved in a drug transaction supports a reasonable belief that the person may be armed and dangerous because weapons and violence are frequently associated with drug transactions. United States v. Bustos-Torres, 396 F.3d 935, 943 (8th Cir. 2005). The district court found that because Officer Palmer remembered Crippen from the October 2008 search of Conroy's house and knew coffee filters are used as part of the methamphetamine manufacturing process, he suspected Crippen was involved in a drug transaction and thus had reasonable suspicion Crippen was armed and dangerous. Accordingly, the pat-down search and seizure of the coffee filter was valid.

Crippen next challenges the search of the truck, arguing that the evidence seized should have been excluded as non-testimonial physical evidence flowing from

involuntary statements made after a <u>Miranda</u>[2] violation. We conclude, however, that Crippen does not have standing to assert his Fourth Amendment challenge to the search. In order to have standing here, Crippen must demonstrate that he personally has a reasonable expectation of privacy in the truck because Fourth Amendment rights may not be asserted vicariously. <u>United States v. Barragan</u>, 379 F.3d 524, 529 (8th Cir. 2004). As a mere passenger in a vehicle with no legitimate expectation of privacy under the seats where the evidence was found, Crippen cannot challenge the search of the truck. <u>Id.</u> at 530.

Crippen cites <u>Brendlin v. California</u>, 551 U.S. 249 (2007), in support of his position that he may challenge the search of the truck as a mere passenger. While <u>Brendlin</u> held that a passenger is seized for Fourth Amendment purposes during a traffic stop and thus may challenge it, <u>id.</u> at 255, 259, here Crippen challenges the search of the truck, not the traffic stop. Because we conclude Crippen does not have standing, we need not decide whether the evidence in the truck should have been excluded as non-testimonial physical evidence flowing from involuntary statements made after a <u>Miranda</u> violation.

B. Motions in Limine

Crippen next challenges the district court's denial of his motions in limine. We review for an abuse of discretion. <u>United States v. Ellison</u>, 616 F.3d 829, 832 (8th Cir. 2010).

Crippen first argues that the district court erred in admitting pseudoephedrine logs bearing his signature because the evidence was protected health information

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[3] Even assuming that pseudoephedrine logs constitute protected health information entitled to HIPAA's privacy protections and that HIPAA protection requires the exclusion of evidence at trial, propositions for which Crippen cites no authority, the requirements of HIPAA were complied with in this case. The pseudoephedrine logs were obtained by subpoena, and entities required to comply with HIPAA may disclose protected health information in compliance with a subpoena under 45 C.F.R. § 164.512(f)(1)(ii)(A).

Crippen next argues that the district court abused its discretion by admitting his prior convictions under Federal Rule of Evidence 404(b). Prior convictions may not be introduced as evidence in order to show propensity to commit the crime charged. Fed. R. Evid. 404(b). If a prior conviction is improper character evidence, it is inadmissible. United States v. Foster, 344 F.3d 799, 801 (8th Cir. 2003). If a prior conviction is not offered as improper character evidence, it is admissible if it satisfies an additional four-factor admissibility test. United States v. Turner, 583 F.3d 1062, 1065-66 (8th Cir. 2009), cert. denied, 130 S. Ct. 1928 (2010). The evidence must:

> (1) be relevant to a material issue raised at trial, (2) be similar in kind and close in time to the crime charged, (3) be supported by sufficient evidence to support a finding by a jury that the defendant committed the other act, and (4) not have a prejudicial value that substantially outweighs its probative value.

United States v. Kern, 12 F.3d 122, 124-25 (8th Cir. 1993).

We conclude that Crippen's prior convictions were not offered as improper character evidence and satisfied the four-factor admissibility test. First, evidence of

---

[3]Pub. L. No. 104-191, 110 Stat. 1936 (codified at scattered sections of 18 U.S.C., 26 U.S.C., and 42 U.S.C.).

Crippen's prior drug involvement is relevant to the material issue of whether he had the requisite intent to enter into a conspiracy to manufacture drugs. Turner, 583 F.3d at 1066. Second, the convictions involved the same conduct, id., and were only seven years old at the time of Crippen's trial. United States v. Trogdon, 575 F.3d 762, 766 (8th Cir. 2009), cert. denied, 130 S. Ct. 1116 (2010). There is no dispute that the convictions were supported by sufficient evidence, and the prejudicial effect of the prior convictions did not outweigh their probative value. The prior convictions were probative of Crippen's knowledge and intent, and the district court's limiting instruction to the jury—that the evidence was admitted only to show knowledge and intent—minimized any prejudicial effect. Turner, 583 F.3d at 1066.

Finally, Crippen contends that the district court erred in admitting portions of the recordings of his phone calls to various individuals from jail. The conversations at issue include brief references to statements made by "Doug," "Wally," and "Snyder," which Crippen argues are hearsay. As the district court ruled, each of the statements Crippen asked the district court to exclude from the recordings merely provided context for other admissible statements made by Crippen and his coconspirators and were not offered for their truth. Accordingly, the statements are not hearsay. See United States v. Spencer, 592 F.3d 866, 879 (8th Cir. 2010).

C. Sufficiency of the Evidence

Crippen claims that the evidence was insufficient to support both his conspiracy to manufacture methamphetamine conviction and his conspiracy to tamper with a witness conviction. We review challenges to the sufficiency of the evidence presented at trial de novo. United States v. Butler, 594 F.3d 955, 964 (8th Cir. 2010). We consider the evidence in the light most favorable to the jury's verdict, draw all reasonable inferences in the Government's favor, and reverse a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. Id.

-10-

To establish a conspiracy to manufacture methamphetamine, the Government must prove: (1) that a conspiracy existed; (2) that the defendant knew of the conspiracy; and (3) that the defendant knowingly became a part of the conspiracy. 21 U.S.C. § 841(b)(1)(C); United States v. Davidson, 195 F.3d 402, 406 (8th Cir. 1999). Even without direct evidence of a conspiracy, the jury may draw reasonable inferences from the evidence presented as to the defendant's state of mind when he did or said the things represented in the evidence. United States v. Wilson, 103 F.3d 1402, 1406-07 (8th Cir. 1997).

In this case, the Government presented ample evidence from which the jury could reasonably infer that a conspiracy existed, that Crippen knew of the conspiracy, and that he knowingly became a part of it. The Government introduced physical evidence of methamphetamine precursors and other items used in the manufacturing process discovered at Conroy's house in October 2008 and in the vehicle in January 2009, and the Government established that Crippen was present at both these locations. In addition, the Government introduced the coffee filter with methamphetamine residue seized from Crippen's pocket during the January 2009 traffic stop. The jury heard a recording of Daniels' controlled delivery of pills to Conroy's house, which included a conversation between Crippen and Conroy where they discussed the need to obtain lithium batteries and pseudoephedrine pills and that another person had placed pseudoephedrine pills in Conroy's truck. The jury also saw a surveillance video showing Crippen retrieve the pills from Conroy's truck. This evidence was sufficient to support Crippen's conviction for conspiracy to manufacture methamphetamine.

To establish a conspiracy to tamper with a witness, the Government must prove that the defendant knowingly used intimidation, threatened, or corruptly persuaded another person with intent to cause or induce any person to withhold testimony from an official proceeding or to conspire to do so. 18 U.S.C. § 1512(b)(2)(A). Crippen

-11-

argues that because neither his mother nor anyone else he spoke to about threatening Daniels actually contacted Daniels, the evidence was not sufficient to support Crippen's conviction.

Crippen's argument fails because conspiracy is an inchoate offense, which "is complete on the agreement to violate the law as implemented by one or more overt acts, however innocent such act standing alone may be, and it is not dependent on the success or failure of the planned scheme." United States v. Littlefield, 594 F.2d 682, 684 (8th Cir. 1979). A discussion of how to achieve the purpose of an agreement constitutes an overt act in furtherance of the agreement, United States v. Bertling, 510 F.3d 804, 810 (8th Cir. 2007), cert. denied, 552 U.S. 1304 (2008), and more specifically, telephone conversations "in which plans and arrangements are made in furtherance of the conspiracy are overt acts." United States v. Civella, 648 F.2d 1167, 1174 (8th Cir. 1981).

Here, the Government introduced evidence of Crippen's conversations with his mother, his uncle, and others in which Crippen stated his intent to threaten Daniels and prevent him from testifying. The jury also heard multiple conversations in which Crippen made plans with various individuals about how Daniels would be contacted and persuaded not to testify. This evidence provided sufficient support for the jury's verdict, and the fact that Crippen and his coconspirators did not achieve their purpose is irrelevant. United States v. Joiner, 418 F.3d 863, 867 (8th Cir. 2005).

D. Sentencing Decision

Finally, Crippen argues that the district court erred in determining that the applicable advisory sentencing range under the Guidelines was 262 to 327 months. Crippen first contends that the district court erred in characterizing him as a career offender because his three state felony convictions constituted a single criminal episode, and thus he does not have "at least two prior felony convictions." United

States Sentencing Commission, Guidelines Manual, §4B1.1(a)(3). We review the district court's determination that a defendant qualifies as a career offender de novo. United States v. Ojeda-Estrada, 577 F.3d 871, 875 (8th Cir. 2009), cert. denied, 130 S. Ct. 1112 (2010).

In determining whether a defendant has "two prior felony convictions," the sentences for the convictions must be counted separately under section 4A1.1 of the Guidelines. U.S.S.G. §4B1.2(c). Section 4A1.1 counts prior sentences separately "if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense)." U.S.S.G. §4A1.2(a)(2). If there was no intervening arrest, prior sentences are nonetheless counted separately unless they "resulted from offenses contained in the same charging instrument" or "were imposed on the same day." Id.

Here, there were at least two prior felony convictions for career offender purposes because there was an intervening arrest. Before his conviction in this case, Crippen had three felony convictions for conspiracy to manufacture methamphetamine arising from three incidents in 2001 that Crippen asserts constitute a single criminal episode. In June 2001, when police were called to an active methamphetamine lab in Warren County, Iowa, Crippen fled the scene and a warrant for his arrest was issued. In August 2001, Crippen was arrested in Dallas County, Iowa, for manufacturing methamphetamine and released pending trial. In November 2001, police went to Crippen's house to execute the June 2001 arrest warrant and found materials used in the manufacture of methamphetamine, which resulted in additional charges against Crippen. Because there was an intervening arrest—Crippen was arrested for the August 2001 offense prior to committing the November 2001 offense—he has at least two prior felony convictions under the Guidelines. Crippen nonetheless urges that his sentences should not be counted separately because they were part of the same plea agreement, were ordered to be served concurrently, and would have been imposed on the same day if not for technicalities arising from having charges filed in two separate

counties. Under the Guidelines, however, the presence of an intervening arrest ends the inquiry, and accordingly, Crippen is a career offender.

Crippen next contends that the district court erred in finding him responsible for 62 grams of actual methamphetamine because it used acquitted conduct in violation of the Due Process Clause and because it relied on the PSR's flawed drug quantity calculation. We have rejected the contention that counting acquitted conduct as relevant conduct violates a defendant's due process rights. United States v. Webb, 545 F.3d 673, 677 (8th Cir. 2008), cert. denied, 129 S. Ct. 2021 (2009). There is some merit, however, to Crippen's argument that the drug quantity calculation in the PSR is inconsistent with expert testimony at trial.

Adopting the PSR's recommendation, the district court found Crippen responsible for 62 of the 190 boxes of pseudoephedrine attributed to the conspiracy as a whole, a finding Crippen does not challenge on appeal. The PSR used a one-to-one ratio of boxes of pseudoephedrine pills to grams of actual methamphetamine in calculating Crippen's drug quantity. The PSR based this formula on expert testimony at trial, which it characterized as stating that even under a conservative yield scenario one box of pseudoephedrine yields at least one gram of actual methamphetamine. More precisely, the expert testified that in order to calculate the amount of actual methamphetamine yield from a given amount of pseudoephedrine, the amount of pseudoephedrine in grams is multiplied by 0.92. The expert further testified that this formula represents the theoretical yield of actual methamphetamine and that the highest practical yield of actual methamphetamine from a given number of grams of pseudoephedrine is, at best, 50% of the theoretical yield. The PSR was thus technically incorrect in using boxes of pseudoephedrine instead of grams of pseudoephedrine in calculating the amount of actual methamphetamine.

This mistake is problematic here because the boxes of pseudoephedrine purchased by the coconspirators contained varying amounts of pseudoephedrine and

depending on which boxes Crippen is responsible for, his base offense level under section 2D1.1(c) could change. The pseudoephedrine logs admitted at trial show that some boxes contained only 1.44 grams of pseudoephedrine, while others contained as much as 2.4 grams. Using the formula from the expert testimony, boxes with 2.4 grams would yield approximately 1.1 gram of actual methamphetamine. If Crippen were held responsible for 62 boxes containing 2.4 grams of pseudoephedrine, this would equal 68.44 grams of actual methamphetamine, giving Crippen a base offense level of 32 under section 2D1.1(c)(4) of the Guidelines—the same offense level recommended by the PSR. Boxes with 1.44 grams would yield 0.66 grams of actual methamphetamine. If Crippen were held responsible for 62 boxes containing 1.44 grams of pseudoephedrine, this would equal 42.24 grams of actual methamphetamine, giving Crippen a base offense level of 30 under section 2D1.1(c)(5) of the Guidelines—a lower offense level than the PSR recommended.

Nonetheless, we need not decide whether the district court clearly erred in accepting the PSR's drug quantity calculation because it correctly determined that Crippen qualifies as a career offender. When the offense level for a career offender is "greater than the offense level otherwise applicable," the career offender offense level applies. U.S.S.G. §4B1.1(b). Thus, Crippen's status as a career offender gives him a base offense level of 34, which places him in the 262 to 327 month Guidelines range even if his base offense level for drug quantity were reduced. Id.

## III.

Accordingly, the judgment of the district court is affirmed.

_____