# United States Court of Appeals
## For the First Circuit

Nos. 12-1947, 12-2161

UNITED STATES OF AMERICA,

Appellee,

v.

TERRELL CAMPBELL,
ESLEY PORTEOUS,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Ripple[*] and Thompson,
Circuit Judges.

Sarah A. Churchill, with whom Nicholas & Webb, P.A., was on brief, for appellant Campbell.
Timothy E. Zerillo, with whom John M. Burke and Zerillo Law LLC, were on brief, for appellant Porteous.
Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief for appellee.

December 23, 2013

[*] Of the Seventh Circuit, sitting by designation.

**RIPPLE, Circuit Judge**.  Terrell Campbell and Esley Porteous both pleaded guilty to conspiracy to possess fifteen or more counterfeit access devices, in violation of 18 U.S.C. §§ 371 and 1029(b)(2) (Count One), and possession of fifteen or more counterfeit access devices, in violation of 18 U.S.C. § 1029(a)(3) (Count Two).  Mr. Campbell also pleaded guilty to the use of one or more counterfeit access devices, in violation of 18 U.S.C. § 1029(a)(1) (Count Six).[1]  The district court sentenced Mr. Campbell to eighteen months' imprisonment and three years' supervised release and sentenced Mr. Porteous to twelve months' imprisonment and three years' supervised release.  Both defendants were ordered to pay restitution in the amount of $8,687.01, for which they are jointly and severally liable.[2]

The defendants timely appealed.[3]  They now argue that law enforcement officers lacked reasonable suspicion for the vehicle stop under Terry v. Ohio, 392 U.S. 1 (1968), that law enforcement's ensuing warrantless search of the vehicle violated the Fourth Amendment, that the search warrant later obtained for the vehicle

---

[1]  Counts Three through Five charged only codefendant Michael Barnes, who is not participating in this appeal.

[2]  Barnes is also jointly and severally liable for this restitution payment.

[3]  The defendants had entered conditional guilty pleas pursuant to Federal Rule of Criminal Procedure 11(a)(2), in which they reserved their right to appeal the district court's denial of their motions to suppress evidence obtained during a Terry vehicle stop that resulted in a vehicle search.

did not issue on probable cause and that admission of the defendants' uncounseled statements made at the scene of the Terry stop violated the Fifth Amendment because they were obtained without warnings, in violation of Miranda v. Arizona, 384 U.S. 436 (1966). Additionally, Mr. Campbell challenges his sentence.

We affirm the judgment of the district court for the following reasons. First, the district court correctly held that the stop of the defendants' vehicle did not violate the Fourth Amendment. Accordingly, the warrant issued for the search of the car was not tainted by an illegal stop. Second, the defendants have failed to establish that they had a reasonable expectation of privacy in the vehicle searched after the stop. Therefore, they can neither object to the search nor seek suppression of the evidence obtained in that search. Third, the admission of statements obtained through the officers' questioning of the defendants at the traffic stop did not violate the Fifth Amendment. Consequently, the district court properly refused to suppress evidence gained as a result of the questioning. Finally, the district court did not abuse its discretion in imposing a mid-guidelines-range sentence on Mr. Campbell.

BACKGROUND

A.  Facts

On May 21, 2011, Scarborough Police Department Patrol Officer Craig Hebert responded to a report of suspicious conduct at an electronics store, Bull Moose, in Scarborough, Maine.  Officer Hebert and a colleague, Officer Tim Dalton, interviewed the store's clerks.  The clerks told the officers that three black men had come to the store.  Each one entered separately and departed before the arrival of the next one.  Each had attempted to purchase video game systems.  The first man successfully used a credit card to pay $700 for two systems.  The second man attempted a similar purchase, but both credit cards he presented were declined.  The name on both of the declined credit cards was the same name as the one on the credit card presented earlier by the first man.  The third man entered the store and expressed an interest in purchasing video game systems.  A clerk told him that Bull Moose could not sell him a game system and suggested that he go to the Toys "R" Us store in South Portland, Maine.  The three men departed together in the same SUV, which had New York license plates.  The clerks told the officers the vehicle's license plate number and said that the men likely were headed to Toys "R" Us.

Officer Hebert called dispatch; he provided a description of the vehicle and its license plate number, and he said that the

vehicle was occupied by three black males. South Portland Police Department Patrol Officer Kevin Gerrish heard the dispatch call to look for the SUV in the Toys "R" Us parking lot. He identified an unoccupied vehicle matching the description.[4] Officer Gerrish waited in the parking lot and saw three black males exiting Toys "R" Us carrying bags of merchandise. The men got into the vehicle and left the store parking lot. Officer Gerrish called dispatch, and either dispatch or Officer Hebert told Officer Gerrish to stop the vehicle.[5]

---

[4] Two of the license plate numbers were transposed from what the Bull Moose clerks had reported to Officer Hebert, but the license plate numbers otherwise matched.

[5] At the suppression hearing, Officer Hebert testified as follows:

> Q. And were you able to obtain what you described as more clear information?
>
> A. Yes. It was determined that the first male went in, used a credit card, bought the gaming systems and the credit card went through and then the second male that came actually attempted to use two different credit cards, both with the name Shawn Collins, and then the third male never actually used the card, but asked about gaming systems and for whatever reason, they told him they couldn't sell them and he asked if there was a Toys R Us around or they directed him to Toys R Us.
>
> Q. Did the [sic] learn what the name on the credit card that the first male used was?
>
> A. Mr. Kelley and Gillam [the clerks] stated that all three cards were the same name, Shawn Collins.
> Q. What did you do in response to learning

Officer Gerrish stopped the vehicle in a hotel parking lot. He approached the vehicle and requested a license from the

---

> this information?
>
> A. Shortly thereafter, I heard Officer Gerrish from South Portland Police Department get on our primary and advise that the vehicle—the occupants were—had gotten into the vehicle and were about ready to leave the parking lot and asked what I wished to do.
>
> Q. Did you convey your wishes to Officer Gerrish?
>
> A. I advised him to go ahead and initiate a traffic stop and that I would be right along.
>
> Q. And at the time, what was your basis for authorizing him to initiate a traffic stop?
>
> A. Essentially the information that Mr. Gillam and Kelley provided me was very comparable with what took place with the use of at least two separate credit cards with the name of Shawn Collins, hadn't yet determined—been determined whether or not the first card was the same as the other two cards, the first subject used a card that was the same as the second subject, but the second subject had used two cards so there were at least two separate credit cards that they saw him use with the name Shawn Collins. The second was declined.
>
> Along with the vehicle description, it was pretty specific, gave a description with the license plate number out of New York and also, I had previous knowledge as to an incident that had previously taken place, one of which that was—I was initially thinking of was a complaint that Officer Beller took at Christmas Tree Shops.

R.78 at 12-13.

-6-

driver, Michael Barnes, as well as the vehicle's registration and proof of insurance.  Barnes was unable to produce a license.  Mr. Campbell and Mr. Porteous both provided valid identification at Officer Gerrish's request.  Officer Gerrish told the men that there was a report that they had had trouble with credit cards at Bull Moose.  Their response was "evasive";[6] one man said that he was not at Bull Moose, and the others confirmed the assertion.  Officer Gerrish testified that, at some point during this initial exchange of information, he smelled the scent of marijuana coming from the vehicle.[7]

Officer Gerrish asked Barnes to get out of the car.  Barnes got out of the car and spoke with Officer Gerrish away from Mr. Campbell and Mr. Porteous.  Barnes told Officer Gerrish that the vehicle was rented and that the men were visiting friends in the area.  Officer Gerrish patted down and handcuffed Barnes.

In the meantime, Officer Hebert arrived on the scene.  Officer Hebert asked Mr. Campbell, who was sitting in the rear passenger-side seat, to exit the vehicle.  Mr. Campbell complied, and Officer Hebert led him away from the vehicle for questioning.

_____

[6]  R.73 at 4.

[7]  The defendants have suggested that Officer Gerrish did not actually smell marijuana.  However, the magistrate judge found, based on the observation of testimony, which included testimony regarding Officer Gerrish's training and experience in drug detection, that "Officer Gerrish did subjectively believe that he could smell the odor of marijuana."  Id.  The magistrate judge did not clearly err in making this determination.

-7-

Mr. Campbell identified himself, said that he was from Brooklyn and said that he and the other men were visiting family in the area. Mr. Campbell initially said that he had been at Bull Moose, but later denied being there and said that he had been in a nearby Subway sandwich shop. When asked about using credit cards at Bull Moose, Mr. Campbell said, according to Officer Hebert, "what cards, what credit cards."[8]

Two additional officers also arrived on the scene, Officer Dalton and Scarborough Police Department Sergeant Tom Chard.[9] Sergeant Chard brought a "K-9 partner," a Belgian Malinois named Chesca.[10] Sergeant Chard asked Mr. Porteous, who was seated in the front passenger-side seat, to exit the vehicle. Sergeant Chard asked Mr. Porteous what the men were doing in the area, and Mr. Porteous said they were looking for jobs. Mr. Porteous said that he had rented the vehicle.[11]

---

[8] R.78 at 22.

[9] The magistrate judge's Recommended Decision identifies Sergeant Chard as a member of the South Portland Police Department. In its response to the defendants' objections to this Recommended Decision, the Government clarified that Sergeant Chard was a member of the Scarborough Police Department.

[10] The magistrate judge found that Chesca was certified in "evidence detection." See R.73 at 5 & n.4. At the suppression hearing, Sergeant Chard testified that he had been working with Chesca since June 2008 and that he did four hours of narcotics training with her per week. The Government proffered certifications for Chesca in narcotics detection and patrol.

[11] The defendants claim that Barnes previously had told Officer Gerrish that he (Barnes) had rented the vehicle. The

-8-

None of the defendants were given <u>Miranda</u> warnings at any time during the stop. While other officers were speaking to the defendants, Officer Gerrish entered the driver's side of the vehicle, front and back, and briefly looked over the passenger compartment. He also opened the hatchback and briefly looked over merchandise located there.

Then, Sergeant Chard asked Mr. Porteous whether he could put Chesca in the car. Mr. Porteous responded affirmatively. Sergeant Chard put Chesca into the vehicle, and he observed her alerting in three areas: the glove box, the pocket of the passenger-side front door and the center console. Without requesting additional consent, Sergeant Chard searched the glove box and the center console and found only marijuana residue.[12] When Chesca alerted to the glove box, it was locked. Sergeant Chard retrieved a vehicle key, unlocked the glove box and searched inside. In the glove box, he found a box, which he also opened. Inside the box, he found approximately fifty identification and credit cards and three wallets.

After finding the box containing the cards, the officers handcuffed the defendants and transported them for processing. The

---

record does not resolve the question of who actually rented the vehicle. <u>See</u> R.78 at 157-58.

[12] Sergeant Chard also found cigar "blunts," which are frequently used to smoke marijuana, in the vehicle. Officer Gerrish later observed ash in a rear pocket of the car.

officers seized the vehicle and impounded it.  The South Portland Police Department received a warrant from a judge of the Maine district court to search the vehicle.  The warrant authorized the police to seize, among other items, credit cards and game systems already known to be in the vehicle.

## B.  District Court Proceedings

Following their indictment, Mr. Campbell and Mr. Porteous moved to suppress evidence obtained in connection with the vehicle stop and search.  Specifically, the defendants argued that: (1) the defendants had standing to challenge the search as violating the Fourth Amendment;[13] (2) there was no reasonable articulable suspicion justifying the stop of the vehicle; (3) the warrantless search of the vehicle was not based on probable cause or valid consent; (4) the search warrant later obtained for the vehicle was not based on probable cause; (5) the defendants' Fifth Amendment rights were violated due to the officers' failure to inform them of their rights under Miranda; and (6) statements and evidence obtained through the stop and interrogation were fruits of the poisonous tree and should be suppressed.

---

[13] Before the district court, the Government contended that neither Mr. Campbell nor Mr. Porteous, as mere passengers, had a reasonable expectation of privacy in the vehicle, and, therefore, neither defendant could object to its search.  The district court did not address this issue.  In its brief to this court, the Government notes in a footnote that it does not concede the "standing" of the defendants to object.  See Gov't Br. 35 n.4.

The magistrate judge who conducted the suppression hearing concluded that the vehicle stop was based on the reasonable suspicion that the defendants were involved in fraudulent credit card transactions at Bull Moose and Toys "R" Us. The magistrate judge rejected the defendants' arguments that the stop was based on a "mere hunch" or on racial profiling.[14] The defendants' activity, she concluded, "would reasonably have caused any prudent person to suspect the fraudulent use of credit cards to purchase high-demand consumer electronics."[15]

The magistrate judge also concluded that the warrantless search of the vehicle was permitted under the consent and automobile exceptions to the Fourth Amendment's warrant requirement. The magistrate judge further determined that there was probable cause for issuance of the warrant to search the vehicle and seize contraband found in it. Finally, the magistrate judge concluded that Miranda warnings were not required because the defendants were not "in custody": "In light of all of the facts and circumstances, a reasonable person standing in [the defendants'] shoes would not have believed that he was being subjected to a restraint equivalent to a formal arrest."[16] On

---

[14] R.73 at 8.

[15] Id. at 9.

[16] Id. at 11.

February 1, 2012, the district judge entered an order accepting the magistrate's recommendation.

Neither the magistrate judge nor the district court addressed whether the defendants had the requisite privacy interest to address any of the issues concerning the search.

## II

## DISCUSSION

### A.  Stop and Search of the Vehicle

We first consider the defendants' argument that the district court should have suppressed evidence obtained during the stop and search of the vehicle.  In reviewing a district court's denial of a motion to suppress, we review its findings of fact for clear error and its conclusions of law de novo.  United States v. Diaz, 519 F.3d 56, 61 (1st Cir. 2008).  "Absent an error of law, we will uphold a refusal to suppress evidence as long as the refusal is supported by some reasonable view of the record."  United States v. Lee, 317 F.3d 26, 29-30 (1st Cir. 2003).

The defendants submit two separate arguments.  First, they argue that the stop of the vehicle constituted an unlawful seizure under the Fourth Amendment.  Second, they contend that a law enforcement officer's ensuing search of the vehicle violated the Fourth Amendment's prohibition against unreasonable searches. We shall address each argument in turn.

-12-

### 1. The Vehicle Stop

The defendants submit that the district court erred in holding that Officer Gerrish's stop of the vehicle was constitutional because it was based on reasonable articulable suspicion.

We begin by setting forth the Fourth Amendment principles governing investigative stops. In <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1, 22 (1968), the Supreme Court articulated the watershed principle that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Temporary traffic stops are analogous to these so-called <u>Terry</u> stops. <u>Berkemer</u> v. <u>McCarty</u>, 468 U.S. 420, 439 (1984). Stopping a vehicle and temporarily detaining its occupants constitutes a seizure for Fourth Amendment purposes. <u>United States</u> v. <u>Cortez</u>, 449 U.S. 411, 417 (1981) (collecting cases); <u>Delaware</u> v. <u>Prouse</u>, 440 U.S. 648, 653 (1979). Because the defendants, as passengers in the stopped automobile, were seized within the meaning of the Fourth Amendment, they may contest whether the stop of the vehicle meets Fourth Amendment standards. <u>Brendlin</u> v. <u>California</u>, 551 U.S. 249, 251 (2007); <u>see</u> <u>United States</u> v. <u>Symonevich</u>, 688 F.3d 12, 19 (1st Cir. 2012).[17]

---

[17] <u>See</u> <u>also, e.g.</u>, <u>United States</u> v. <u>Figueredo-Diaz</u>, 718 F.3d 568, 576 & n.5 (6th Cir. 2013); <u>United States</u> v. <u>Crippen</u>, 627 F.3d 1056, 1063 (8th Cir. 2010); <u>United States</u> v. <u>Cortez-Galaviz</u>, 495

-13-

A warrantless traffic stop satisfies the Fourth Amendment's reasonableness requirement, U.S. Const. amend. IV, if "police officers have a reasonable suspicion of wrongdoing—a suspicion that finds expression in specific, articulable reasons for believing that a person may be connected to the commission of a particular crime." Lee, 317 F.3d at 31; see also United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012). To constitute reasonable suspicion, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002).

The Supreme Court has eschewed, emphatically, any reliance on a rigid test or formula to give the concept substance. Rather, it has emphasized that the determination must be grounded in the "totality of the circumstances." Cortez, 449 U.S. at 417; see also Jones, 700 F.3d at 621; United States v. Coplin, 463 F.3d

---

F.3d 1203, 1205 n.3 (10th Cir. 2007); United States v. Diaz-Castaneda, 494 F.3d 1146, 1150 (9th Cir. 2007); United States v. Soriano-Jarquin, 492 F.3d 495, 499-500 (4th Cir. 2007); 3 Wayne R. LaFave et al., Criminal Procedure § 9.1(d), at 404-05 (3d ed. 2007) (noting that "[a]ny remaining doubt" as to whether passengers had standing to object to the stop of a vehicle or to the length of the passenger's subsequent detention "was removed in Brendlin v. California"); 1 David S. Rudstein et al., Criminal Constitutional Law § 11.02(2)(b)(iii)(B) (2013) ("[A] passenger in a vehicle that is stopped by law enforcement has been 'seized' and therefore can challenge the validity of the police action in stopping the vehicle in which he was riding.").

96, 100 (1st Cir. 2006). Nevertheless, the Court has disciplined the reasonable suspicion standard by requiring "some objective manifestation" that the person stopped either is wanted for past criminal conduct, or is engaging or about to engage in such conduct. Cortez, 449 U.S. at 417 & n.2. A mere "hunch," therefore, will not justify a stop. Terry, 392 U.S. at 22, 27.

Information that is received from others in the course of an investigation, as the Court emphasized in Adams v. Williams, 407 U.S. 143, 147 (1972), varies in its "value and reliability":

> Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response.

In short, in our search for "some objective manifestation," we must recognize that, at bottom, the inquiry deals not with "hard certainties, but with probabilities." Cortez, 449 U.S. at 417-18. In the Supreme Court's words:

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the

-15-

circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

Id. at 418. With these principles in mind, we turn to the case before us.

Here, the stop occurred after the police had received a report from store employees that suggested that the defendants may have engaged in, or attempted to engage in, credit card fraud. These clerks worked for an established business within the officers' jurisdiction and, as part of the store's sales force, their work undoubtedly included being alert for fraudulent activity at the store. Moreover, in a face-to-face situation, the officers

-16-

had an opportunity to judge the credibility of the clerks and the accuracy of their report. The Bull Moose clerks gave the officers specific information. They described their serial encounters with the defendants and specifically told the officers that two different defendants had attempted to use credit cards bearing the same name. The clerks further gave the police a description of the defendants' vehicle, including the license plate number. They also provided, on the basis of their conversation with the defendants, the probable location of the defendants' next stop.

Although this encounter already gave the police officers a great deal of information upon which to formulate a suspicion of illegal activity, the officers went a step further before executing the stop and checked the clerks' estimation of the defendants' whereabouts. An officer went to the Toys "R" Us where, according to the clerks, the defendants might next appear. The officer found a vehicle matching the description of the defendants' vehicle. The vehicle's out-of-state license plate number matched that reported by the clerks, with the exception of one instance of inverted numerals. Shortly afterward, the officer observed the defendants approach the vehicle. They were carrying bags, suggesting that they had purchased items in the Toys "R" Us, as the clerks at the earlier establishment predicted they might do. The "men not only were in the right place at the right time but also fit the suspects' descriptions." Lee, 317 F.3d at 31. In short, only

after law enforcement officers had learned all of the facts surrounding the suspected criminal activity and had corroborated the details did Officer Gerrish stop the defendants' vehicle.

We think that this case is sufficiently similar to the situation that confronted us in Lee as to be controlled by the principles articulated in that case. There, a store employee contacted the police to report suspected attempted credit card fraud. Id. at 30. The employee told police that "a young Asian male had tried (but failed) to purchase a $2,300 wristwatch using not one but two platinum American Express cards ostensibly issued in the name of Zhi Lin." Id. When a police officer arrived at the store's parking lot, he observed a van containing two individuals matching the employee's description. Id. The officer approached the vehicle, and the driver attempted to pull away before the officer forced him to stop. Id. We held that the "collocation of circumstances plainly satisfied the reasonable suspicion standard for an initial Terry stop." Id. at 31.

As in Lee, the circumstances surrounding the present defendants' actions at Bull Moose and in the Toys "R" Us parking lot justified Officer Gerrish's stop. The district court correctly concluded that the stop was supported by reasonable articulable suspicion.[18]

---

[18]    Mr. Campbell makes one additional argument about the initial stop of the vehicle. He submits that "there was no probable cause to believe a crime was committed when the vehicle

-18-

## 2.  The Vehicle Search

The defendants next challenge the district court's determination that the warrantless search of the vehicle, from the drug-detection dog's entrance into the vehicle through the search of the locked glove box, did not violate the Fourth Amendment.  The district court took the view that the defendants' consent, as well as the automobile exception to the Fourth Amendment's warrant requirement, brought that search within constitutional bounds.

In examining this question, we are confronted at the beginning of our analysis by an important threshold question.  The defendants base their challenge to the search of the automobile on their status as passengers in that automobile.  Following the decision of the Supreme Court in Rakas v. Illinois, 439 U.S. 128 (1978), we have held squarely that passengers in an automobile who assert no property or possessory interest in a vehicle cannot be said to have the requisite expectation of privacy in the vehicle to

---

was stopped."  Campbell Br. 19.  Consequently, he continues, the warrant later issued for the search of the vehicle was invalid because it was based on the information discovered in an illegal stop.  There are two problems with Mr. Campbell's argument.  First, he has conflated the standards for a Terry stop of a vehicle and for the issuance of a warrant.  The officers needed only reasonable suspicion to stop the vehicle, and we already have determined that such suspicion was present.  Second, Mr. Campbell's argument neglects the importance of timing in a probable cause inquiry.  Probable cause can "accrete[] gradually as an investigation progresses."  United States v. Lee, 317 F.3d 26, 32 (1st Cir. 2003).  Law enforcement can stop a car only on reasonable suspicion, and then "the circumstances giving rise to reasonable suspicion . . . and the developments that unfold[] during the Terry stop [can furnish] probable cause."  Id.

permit them to maintain that the search did not meet Fourth Amendment standards. <u>United States</u> v. <u>Symonevich</u>, 688 F.3d 12, 19, 21 (1st Cir. 2012).[19]

Mr. Campbell never has claimed a possessory interest in the vehicle.[20] In his motion to suppress and at the hearing on that motion, Mr. Porteous asserted, forcefully, that he did not lease the car.[21] To put it mildly, in taking those positions, neither

---

[19] <u>See</u> <u>also,</u> <u>e.g.</u>, <u>Crippen</u>, 627 F.3d at 1063 (holding that a passenger may challenge his seizure at a traffic stop but may not challenge the search of a vehicle); <u>United States</u> v. <u>Paulino</u>, 850 F.2d 93, 96-97 (2d Cir. 1988) (holding that although a passenger had manifested a subjective expectation of privacy in the area under a car mat where he hid contraband, he failed to demonstrate that such an expectation was objectively reasonable and therefore lacked standing to challenge the search).

[20] In its opposition to the motion to suppress, the Government asserted that, in light of their lack of any possessory interest, the defendants could not litigate the search of the automobile. The district court did not address the issue. In this court, the defendants did not address the matter in their opening briefs, but the Government preserved adequately the issue by noting it in its brief and providing the controlling authority. Gov't Br. 35 n.4 (citing <u>United States</u> v. <u>Symonevich</u>, 688 F.3d 12, 18-21 (1st Cir. 2012)); <u>cf.</u> <u>Rubin</u> v. <u>Islamic Republic of Iran</u>, 709 F.3d 49, 54 & n.4 (1st Cir. 2013) (noting that to preserve an issue for appeal, it generally must be raised before the district court and in a party's opening brief).

[21] We acknowledge that the district court determined, on the basis of Sergeant Chard's testimony at the suppression hearing, that Mr. Porteous told the Sergeant that he had rented the car. Notably, the district court did not find that Mr. Porteous in fact <u>had</u> leased the car; the court merely determined that Mr. Porteous <u>told</u> the Sergeant that he had done so. Although Mr. Porteous's statement to the Sergeant well may have given the officer a basis for believing that Mr. Porteous had apparent authority to consent to the search of the car (a question we need not decide today), for purposes of evaluating the district court's ruling on the motion to suppress, we accept Mr. Porteous's position that he did not have a

defendant has carried his burden to establish a reasonable expectation of privacy in the vehicle. See United States v. Lipscomb, 539 F.3d 32, 35-36 (1st Cir. 2008) ("Before reaching the merits of a suppression challenge, the defendant carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched . . . ."); id. at 36 (holding that the defendant lacked the expectation of privacy required to challenge a seizure where the defendant "actively disowned any interest in any of the seized items" and "repeatedly asserted" at the hearing on his motion to suppress that the contraband seized was not his).[22]  Accordingly, because neither Mr. Campbell nor

possessory interest in the vehicle.

    Our analysis of this question is not contrary to the holding of the Supreme Court in Simmons v. United States, 390 U.S. 377 (1968).  There, the defendant testified at the suppression hearing that he owned a particular suitcase because he justifiably believed that such testimony was necessary to establish the requisite standing to object to the search. Id. at 381.  The Supreme Court held that such testimony could not be used against the defendant during trial to establish his guilt. Id. at 394.  The situation here is materially different.  No one is using Mr. Porteous's statement against him.  Rather, Mr. Porteous denies he made the statement and, in any event, abjures any reliance on a property interest in his motion to suppress. See United States v. Samboy, 433 F.3d 154, 162 (1st Cir. 2005) (holding that the defendant had not demonstrated a reasonable expectation of privacy in an apartment that was searched where his "strategy throughout the proceedings was to distance himself from any possible interest" and noting that the defendant could have argued, but did not, "that he lacked an interest at trial while arguing that he did in fact have a recognized interest . . . in his motion to suppress").

    [22]  See also Symonevich, 688 F.3d at 21 n.6 ("The burden to establish a reasonable expectation of privacy lies squarely on the movant."); United States v. Rodríguez-Lozada, 558 F.3d 29, 37 (1st Cir. 2009); Samboy, 433 F.3d at 161 (quoting Minnesota v. Carter,

-21-

Mr. Porteous established a privacy interest in the car, they cannot object to its search by the officers.

Because the defendants do not assert the requisite privacy interest in the vehicle that was searched, they cannot make any claim about the legality of the search of the vehicle. We therefore have no reason to address their contentions with respect to that search.

## B. Uncounseled Questioning at the Scene of the Vehicle Stop

The defendants next submit that the law enforcement officers should have supplied Miranda warnings before questioning them at the scene of the vehicle stop and that any statements made in the absence of such warnings should be suppressed.

In evaluating the district court's ruling on whether the defendants were "in custody" for Miranda purposes, we review the court's factual assessment of the circumstances surrounding the interrogation for clear error. United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011). Then, we review de novo whether, "viewed objectively, the discerned circumstances constitute the requisite 'restraint on freedom of movement of the degree associated with a

---

525 U.S. 83, 88 (1998)); cf. United States v. Salvucci, 448 U.S. 83, 95 (1980) (remanding a case that came to the Supreme Court "as a challenge to a pretrial decision suppressing evidence" so that the defendants could "attempt to establish that they had a legitimate expectation of privacy in the areas" searched).

formal arrest.'"  Id. (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)).

Miranda v. Arizona, 384 U.S. 436 (1966), held that the Fifth Amendment requires "the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." Minnesota v. Murphy, 465 U.S. 420, 430 (1984).  The purpose of the Miranda doctrine is to combat the specific characteristics of custodial interrogation that "work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  Miranda, 384 U.S. at 467. Accordingly, Miranda "does not apply outside the context of the inherently coercive custodial interrogations for which it was designed."  Roberts v. United States, 445 U.S. 552, 560 (1980). "Custody" for purposes of Miranda must be "narrowly circumscribed" to effectuate the precise purpose of the warnings.  See Murphy, 465 U.S. at 430.  In determining whether a person was in custody for this purpose, therefore, a court must keep in mind that "[t]he warnings protect persons who, exposed to such interrogation without the assistance of counsel, otherwise might be unable to make a free and informed choice to remain silent."  Roberts, 445 U.S. at 560-61.

In determining whether a person detained at a vehicular stop should have been given <u>Miranda</u> warnings, the Supreme Court and the courts of appeals have followed the principles that we just have articulated. In <u>Berkemer</u> v. <u>McCarty</u>, 468 U.S. 420, 440 (1984), for instance, the Supreme Court held that <u>Miranda</u> warnings are not required during routine stops involving traffic matters. The Court acknowledged that a traffic stop is a "seizure" for Fourth Amendment purposes because "few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." <u>Id.</u> at 436-37. The Court distinguished traffic stops from the setting that occurs in <u>Miranda</u>—jailhouse interrogations. <u>Id.</u> at 437-39. "[C]ircumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." <u>Id.</u> at 438. Traffic stops are usually temporary and brief. <u>Id.</u> at 437-38. They are public, which "both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." <u>Id.</u> at 438. Typically each motorist is confronted by only one or two policemen. <u>Id.</u> All of this combines to make a traffic stop "substantially less police dominated" than "the kinds of interrogation at issue in <u>Miranda</u> itself." <u>Id.</u> at 439 (internal quotation marks omitted). Traffic stops are "comparatively

-24-

nonthreatening," and therefore do not require Miranda warnings to counter the threat of coercion.  Id. at 440.

Notably, despite its holding that, generally, law enforcement officers are not required to give Miranda warnings at traffic stops, the Court established no categorical rule.  Indeed, it held that Miranda warnings would be required "as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'"  Id. (quoting Beheler, 463 U.S. at 1125).  Thus, our task post-Berkemer is to determine whether the facts of a specific case indicate a situation more akin to a routine traffic stop, at which Miranda warnings are not required, or indicate that a suspect has been "subjected to restraints comparable to those associated with a formal arrest," at which point Miranda warnings are required.  Id. at 441.  In understanding this analysis, we begin by noting that the Court has held that a traffic stop is analogous to a Terry stop and, therefore, "that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda."  Id. at 440.  In the course of its opinion, the Supreme Court also noted "the absence of any suggestion in [its] opinions that Terry stops are subject to the dictates of Miranda" due to "[t]he comparatively nonthreatening character of detentions of this sort."  Id.

In focusing on Terry stops, we also have recognized that, as "a general rule, Terry stops do not implicate the requirements

of Miranda, because Terry stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates Miranda warnings." United States v. Streifel, 781 F.2d 953, 958 (1st Cir. 1986) (internal quotation marks omitted). More recently, in United States v. Fornia-Castillo, 408 F.3d 52 (1st Cir. 2005), we have reiterated that general approach while observing, as the Supreme Court did in Berkemer, that a valid investigatory stop can "escalate into custody" for Miranda purposes "where the totality of the circumstances shows that a reasonable person would understand that he was being held to 'the degree associated with a formal arrest.'" Id. at 63 (quoting Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam)). While no "scientifically precise formula" can determine whether a Terry stop rises to the level of a formal arrest, United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001) (internal quotation marks omitted), the "ultimate inquiry" is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[23] Thompson v. Keohane, 516 U.S. 99, 112 (1995) (internal quotation marks omitted). Keeping in mind that the test is an objective one, Stansbury, 511 U.S. at 323, we focus (without limitation) on four

---

[23] To the extent that the defendants suggest that Miranda comes into play simply because a reasonable person in their shoes would not have felt free to leave, that suggestion is foreclosed by United States v. Streifel, 781 F.2d 953, 960-62 (1st Cir. 1986).

factors: (1) "whether the suspect was questioned in familiar or at least neutral surroundings"; (2) "the number of law enforcement officers present at the scene"; (3) "the degree of physical restraint placed upon the suspect"; and (4) "the duration and character of the interrogation." Hughes, 640 F.3d at 435 (internal quotation marks omitted).[24]

We believe that the circumstances surrounding this stop would not be viewed by a reasonable person as the functional equivalent of a formal arrest. The defendants were questioned in a neutral location, a hotel parking lot. See United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) ("Although the location apparently was not familiar to [the defendant] and the area was not well-lit, a public highway is a neutral setting that police

---

[24] We note that this approach is consistent across the circuits. See, e.g., United States v. FNU LNU, 653 F.3d 144, 153 (2d Cir. 2011); United States v. Acosta, 363 F.3d 1141, 1148-50 (11th Cir. 2004); United States v. Foster, 70 F. App'x 415, 416-17 (9th Cir. 2003); United States v. Leshuk, 65 F.3d 1105, 1108-10 (4th Cir. 1995); United States v. Lennick, 917 F.2d 974, 976-78 (7th Cir. 1990); see also 3 William E. Ringel, Searches and Seizures, Arrests and Confessions § 27:7 (2d ed. 2013) ("Courts are also virtually unanimous in finding that questioning of a suspect during an investigative stop authorized under Terry v. Ohio, does not meet the requirement of custodial interrogation. . . . [I]t is likely from the Court's language that some roadside detentions might constitute 'custody' under Miranda, given the right set of circumstances—e.g., a lengthy detention, the show of force, or placement of the suspect into the police vehicle." (footnote omitted)); id. § 27:8 (pointing out that cases consider the location and length of questioning, the number of police officers present, whether the police made a statement as to whether the defendant was in custody, the use of physical restraint, the nature of questioning, the officers' demeanor and the use of a weapon).

-27-

officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse."). There were four or five police officers on the scene questioning three defendants. The police officers split up and questioned the defendants separately, such that each defendant was questioned by at most two officers. There is no indication that this police-to-suspects ratio was overwhelming to the defendants. See United States v. Crooker, 688 F.3d 1, 12 (1st Cir. 2012) (determining that suspect was not "in custody" for Miranda purposes where "no more than two agents were in direct conversation" with the suspect at one time). Although the defendants may have temporarily been unable to use their cellular phones, neither Mr. Campbell nor Mr. Porteous was physically restrained at the time of the questioning. See id.; Hughes, 640 F.3d at 435-36. The law enforcement officers on the scene made no show of force by using their weapons. Cf. Crooker, 688 F.3d at 4, 11-12 (holding that suspect was not in custody even where law enforcement officers initially approached house with weapons drawn). Finally, the duration and character of the interrogation weigh in favor of finding that the defendants were not in custody. There is no indication that the stop lasted for an inappropriately long period of time or that the officers acted with hostility toward the defendants. See United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011) (holding that suspect was not in custody where the atmosphere was "relatively calm and

-28-

nonthreatening" and the interview lasted "a relatively short time").

In similar circumstances, we have determined that suspects were not in custody at the time of questioning. For example, in Crooker, 688 F.3d at 4, law enforcement agents executed a search warrant at the defendant's house. There were between four and eight agents, who approached the house with weapons drawn. Id. During a multiple-hour search, two agents conversed with the defendant. Id. at 5. The agents did not advise the defendant of his Miranda rights or arrest him. Id. The defendant made incriminating statements about the location of firearms, ammunition and marijuana in the house. Id. The district court denied the defendant's motion to suppress those statements; we affirmed, concluding that the defendant "was not in custody for Miranda purposes." Id. at 6, 11-12. We specifically considered that the interrogation was conducted in the "significantly less intimidating" setting of the defendant's home; that the officers' weapons were holstered throughout the majority of the search; that no more than two agents were in direct conversation with the defendant at any given time; that the defendant never was restrained physically; and that the interactions were "cooperative and relatively brief." Id. at 11-12; see also Hughes, 640 F.3d at 435-37 (holding that suspect was not in custody where the interview occurred in his home, the number of officers was "impressive but

-29-

not overwhelming" and only two officers participated in the questioning, there was no show of force and no weapons were brandished, the defendant was not restrained physically, the "ambiance was relaxed and non-confrontational" and the interview lasted for ninety minutes—a "relatively short duration"); Fornia-Castillo, 408 F.3d at 57 n.3, 64-65 (holding that suspect was not in custody where single officer stopped suspect on busy public road, at one point drew his service revolver in a defensive position, handcuffed the suspect for ten to fifteen minutes, frisked the suspect and questioned the suspect while he was handcuffed).

Here, because Mr. Campbell and Mr. Porteous were not in custody at the time of their questioning, law enforcement did not have to inform them of their Miranda rights, and the district court properly refused to suppress their statements.

## C. Mr. Campbell's Sentence

"We typically examine sentencing decisions for abuse of discretion, which is really a review for reasonableness." United States v. Denson, 689 F.3d 21, 26 (1st Cir. 2012), cert. denied, 133 S. Ct. 996 (2013).

Mr. Campbell submits that the district court erred in imposing his mid-guidelines-range sentence.[25]  A reviewing court

---

[25]  Mr. Porteous does not appeal his sentence.

must consider both the procedural and substantive reasonableness of a sentence. <u>Gall</u> v. <u>United States</u>, 552 U.S. 38, 51 (2007). Here, Mr. Campbell raises no procedural challenges on appeal.[26] Rather, he challenges the substantive reasonableness of the sentence. In his view, the district court failed to give proper weight to the medical care needed to treat his polymyositis, among other personal factors. <u>See</u> <u>id.</u> at 56-58 (characterizing the weight given to specific facts as a substantive reasonableness question).

We first note that Mr. Campbell raised no objection to the guidelines calculation in the presentence report or to the calculation as explained by the district court during his sentencing hearing. More fundamentally, Mr. Campbell's eighteen-month sentence falls squarely within the sentencing court's guidelines calculation. The base offense level was six. The amount of loss added eight levels and possession of a fraudulent license added two levels. The defendant received a three-level reduction following his guilty plea, so the final offense level was thirteen. Given his criminal history category of II, the resulting guidelines range was fifteen to twenty-one months.

---

[26] Procedural errors include: "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." <u>Gall</u> v. <u>United States</u>, 552 U.S. 38, 51 (2007).

Nevertheless, on appeal, Mr. Campbell submits that the trial court failed to consider adequately his medical needs and life circumstances. To the contrary, the record indicates that the court sufficiently considered those factors. First, the court acknowledged that it had "carefully reviewed the contents of the written presentence investigation report," which describes Mr. Campbell's medical needs and to which Mr. Campbell offered no objection.[27] The court listened to both Mr. Campbell and Mr. Campbell's attorney discuss his medical condition at the sentencing hearing. Prior to announcing the sentence, the court indicated that it had considered the presentence report, the history of the defendant and letters of support (which, according to Mr. Campbell's attorney, discussed the defendant's medical condition). It is clear that the court considered Mr. Campbell's personal circumstances.[28]

Further, the court explained that the eighteen-month sentence it imposed did provide leniency for Mr. Campbell's

---

[27] R.137 at 2, 17-18.

[28] Mr. Campbell also raises that he has a young daughter; that prior to 2009, he had very little interaction with the criminal justice system; and that he had accepted responsibility for his crimes. In announcing Mr. Campbell's sentence, the district court made it clear that it was aware of the defendant's family and history with the criminal justice system. Id. at 18-20. The court's guidelines calculation already included a three-level reduction for acceptance of responsibility. Id. at 18. There is nothing unreasonable in the sentencing judge's treatment of these facts.

personal characteristics.  The court stated that, on the basis of the record, it would have imposed an above-guidelines-range sentence absent such facts because it believed that the seriousness of the offense and the defendant's criminal history, particularly that Mr. Campbell had been out on bail for a similar offense when he committed the crime for which he was being sentenced, warranted an above-guidelines sentence.[29]  However, "because of the letters of support [he] ha[d] received . . . and the recommendation of the Government," the court ordered a "very lenient" sentence.[30]  Under these circumstances, it cannot be said that the sentencing court's decision to issue a mid-guidelines-range sentence was an abuse of discretion.

## Conclusion

The judgment of the district court is affirmed.

**AFFIRMED.**

---

[29]  <u>Id.</u> at 19.

[30]  <u>Id.</u> at 19-20.